# KNOTT *v.* GILES.

HABITUAL DRUNKARDS; DECREES; DECREES PRO CONFESSO; SPECIFIC PERFORMANCE.

1. A decree finding one to be an habitual drunkard in a proceeding under D. C. Code sec. 115f [32 Stat. at L. 524, chap. 1329], for that purpose, is conclusive as to the condition of the alleged drunkard on the date of its rendition, but is not so as of a date prior thereto, although tending to show that the helpless condition must have existed for some period of time.

2. Where a plea to a bill in equity, upon testimony taken, has been found to be false, the proper practice, in ordinary cases, is to enter

a decree upon the bill as if the same had been confessed. (Following *Adriaans* v. *Lyon,* 8 App. D. C. 532.)

3. A decree *pro confesso* is not a decree as of course according to the prayer of the bill, nor merely as the complainant chooses to take it, but should be made by the court, according to what is proper to be decreed upon the statements of the bill, assumed to be true.

4. A decree *pro confesso* admits the facts charged in the bill, but not the conclusions drawn therefrom, nor the conclusions of law. (Following *Perkins* v. *Tyrer,* 24 App. D. C. 447.)

5. It does not necessarily follow, because a defendant to a bill for specific performance admits the facts alleged in the bill, that the complainant is entitled to a decree as prayed. The jurisdiction of equity in such cases is not compulsory, but is the subject of discretion.

6. In general, specific relief will be granted when it is apparent, from a view of all the circumstances of the particular case, that it will subserve the ends of justice; and it will be withheld when, from a like view, it appears that it will produce hardship or injustice to either of the parties.

7. Where a bill for specific performance by a vendee of land shows that, within twenty days from the date of the contract of sale, a petition was filed to have the vendor declared an habitual drunkard, and he was so declared less than twenty days thereafter, and that the committee of the drunkard had been offered $825 an acre for the land sold by the vendor to the complainant for $600 an acre, the bill will be demissed without prejudice to the right of the complainant to pursue his remedy at law, if so advised.

No. 1652. Submitted May 3, 1906. Decided June 5, 1906.

HEARING on an appeal by the defendants from a decree of the Supreme Court of the District of Columbia, sitting as a court of equity, granting specific performance of a contract for the sale of land. *Reversed.*

The COURT in the opinion stated the facts as follows: ·

This is a suit for specific performance of a contract to convey lands. The bill was filed by Thomas J. Giles, on January 27, 1905, against George T. Knott, Creed M. Fulton, and Eugene R. West, and alleges the following facts:

(1) George T. Knott was, on the 11th day of August, 1904,

seised and possessed of a tract of land in the District of Columbia, containing 3.625 acres, of which a particular description is given.

(2) That on August 11, 1904, the following contract was entered into:

Washington, D. C., August 11, 1904.

Received of Thomas J. Giles a deposit of $100 on purchase of a part of the George T. Knott property on north side of Conduit road, west of small public school; property described as follows: Beginning at the west line and running eastwardly to the west line of lane leading to house; then in a northerly direction to the back line of the property; then westwardly on the back line to the extreme west line; thence southerly to the point of beginning. Exact area to be determined by official survey, terms all cash. Property to be sold free of encumbrance, taxes paid to date. Sale to be consummated within thirty days. Title to be of good record or no sale.

The Miller Shoemaker Real Estate Co. (Incorporated),

By J. Barton Miller, Secretary and Treasurer.

Accepted by Thomas J. Giles.

To this is attached the following paper:

August 11, 1904.

I hereby approve of the sale of the Miller Shoemaker Co. of the following portion of my property on the Conduit road: Beginning at the west line and running eastwardly to the west line of lane leading to the house; then in a northerly direction to the back line of the property; then westwardly on the back line to the extreme west line; thence southerly to the point of beginning. Exact area to be determined by official survey. Price of property $600 dollars per acre. Sale to be concluded and money paid in 30 days. Property to be free of debt and taxes. Miller Shoemaker Co. to be allowed 5 % for selling.

George T. Knott.

Witnesses:    J. B. Miller,
              Annie Davis.

This was acknowledged the same day by George T. Knott before said J. Barton Miller, notary public, and was recorded December 9, 1904.

(3) That by the consent and direction of said George T. Knott a survey of the said land was made, showing the area above stated.

Within thirty days of the date of said agreement the complainant notified the defendant that the area of the tract was 3.625 acres, making the consideration $2,175, which sum he tendered together with a deed to be executed and delivered by him. Defendant refused to receive the said money and to execute the said deed.

That defendant, Creed M. Fulton, was, by decree of the supreme court of the District of Columbia, on the 15th day of September, 1904, appointed committee of the person and estate of the defendant, George T. Knott, who had been theretofore found to be an habitual drunkard. Reference is made to the proceedings in said equity cause, No. 24,872.

Thereafter complainant demanded of defendant Fulton that he carry out the contract as aforesaid, which the defendant refused to do, and refused to ask the authority of the court to do so unless the complainant would agree to pay more than $600 an acre for said tract of land.

Thereafter, on the 19th day of January, 1905, the said Fulton obtained an order, in said equity cause, authorizing him as committee of said Knott to sell 3 acres and a fraction of an acre from the extreme northern portion of the tract of land belonging to said Knott to the defendant Eugene R. West for $825 per acre. Said Fulton has not yet conveyed said land to the defendant West, and complainant is informed and believes that no part of the purchase price has been paid, save the sum of $100, claimed to have been deposited on account of the purchase price. Complainant is not advised whether the land authorized to be sold is the same embraced in the aforesaid agreement between complainant and defendant Knott, but avers on information and belief that it is the same property.

That the defendant Fulton had knowledge of said contract

between complainant and defendant Knott at the time he obtained said order of January 19, 1905, and that said Eugene R. West also had knowledge.

Complainant avers performance of all the requirements of said agreement on his part, the refusal of defendant to make conveyance, and complainant's readiness to pay the purchase price as agreed upon.

The prayer is for specific performance of the contract hereinbefore set out. The bill was not sworn to. The defendants entered a plea to the bill to the following effect:

That at the time of making the alleged contract set out in the bill of complaint, whereby the complainant charges that the defendant George T. Knott contracted and agreed to sell him land described in the said bill at the price named therein, which price the defendants aver was inadequate and insufficient, the said George T. Knott had no sufficient knowledge or understanding of the contents of said contract, and was at that time an habitual drunkard incapable of managing or caring for his property or of executing a valid deed or contract. And the defendants pray the judgment of this court whether they shall or ought to be compelled to make any further or other answer to the said bill of complaint.

On behalf of the defendants, Charles A. Baker testified that he lived on the Conduit road about ⅛ of a mile from the defendant, George T. Knott, and had known him for eleven years; that he was on the 11th day of August, and had been for many months prior thereto, satisfied that defendant Knott was thoroughly irresponsible and incapable of transacting his business; that in 1901 he found that defendant was neglecting his business, his place was running down, and from frequent interviews with him witness discovered that he was losing his mentality apparently, and could not carry on any connected conversation; that in almost every instance that he saw Knott he was under the influence of liquor to a very great degree; that he was unable to stand and scarcely able to sit up; that one time he found him lying out near the barn, and upon all these occasions he could get no connected or intelligent replies from him; that con-

dition has continued since 1901; that he has in some respects seemed to be a little better in the last few months, but there is a mental degeneracy which exists and is apparently permanent. Asked to explain what he meant by "mental degeneracy," he said: "Mr. Knott seemed to be wholly incapable of conducting any intelligent or connected discourse; I think that is answer enough." That during the first years of his acquaintance with Knott he gave every evidence of being a pretty intelligent man and managed his business in a business-like manner. He conducted a dairy and truck farm. In August, 1904, his business had run to nothing and no cows were left on the place. On cross-examination he said that he often saw him at his house and frequently met him in the neighborhood; that he was not drunk every time that he met him; that he was drunk about half the time. On three occasions, while not drunk, he was in the condition before described. He could not say that he had seen him on the 11th or 12th day of August, 1904.

Dr. Henderson Suter testified that he had been a physician for over twenty-five years, had known George T. Knott for twenty years at least, and had been his physician; that in July, 1904, he found him unable to get out of bed, unable to walk or move his legs; did not seem to have any idea what he was about and talked incoherently. His condition was due to the excessive use of stimulants; he had been drinking very hard for years. His trouble was mental degeneracy, alcoholic dementia. He was not at that time capable of making a valid contract or transacting any business. Saw him two or three times in August, but was unable to give exact dates. His mental condition was about the same. Examined him again in September to testify in the proceedings in which the committee was appointed. He said: "I would say that his mental condition was that of alcoholic dementia. He was incapable of conducting any conversation or to understand anything, asked rambling questions and seemed to have no sense of responsibility whatever." His condition was the same in a general way that it had been in July and August. He had not been able to get but little liquor and had spent the greater part of his time in bed. Have been his family physi-

cian for twenty years. Saw him then only occasionally. On cross-examination he said that he attended him twelve or fourteen times in July and also in August; gave him tonics of different kinds. He was in bed and could not get whisky because his sister would not give it to him. He was suffering from alcoholic paralysis; could not stand on his legs.

Anna M. Davis, the sister of defendant Knott, testified that she lived with him. "In July and August his mind was so bad that he was out of his head almost all of the time; he sold out his cows and spent every cent of the money; he had one cow left, and would throw sticks to her and think he was feeding her; he talked at random in every way; did not seem to remember anything; mind was so bad that he talked all kinds of talk; did not seem to remember anything, and if I told him anything did not seem to hear." She said that during August, 1904, he would get up out of his bed at night and lie around; he would lie in the stable; would go away; and when witness would miss him would have to get up in the night and hunt for him; would find him in the stable or barns or on the ground, anywhere, and could not persuade him to come in. He said things and did not remember them afterwards,—talked nonsense; sat around as if he did not know what he was doing; would go away and come back without seeming to know where he had been. Witness was present when Miller came and obtained Knott's signature to the contract. "Only the three were present. There was no conversation between Miller and Knott. Miller wrote it down on a piece of paper and called me, and I called defendant Knott, thinking that Mr. Miller had written down on a piece of paper saying he had been offered $600 an acre for the ground. I did not understand it, but thought he had an offer for it. Mr. Miller said he had an offer on the place; he did not say how much at first, but wrote it down on a piece of paper, and I thought he had an offer of $600 per acre, but was still going on to try to get $1,000 if he could. When I had seen him previously I had told him that we wanted $1,000 an acre for the land. On the day that he came he said he had an offer of $600 an acre, and said: 'Wont you take less for a quick sale?' I told him we

wanted $1,000 an acre.  Knott signed the paper when Miller told him to; he did not say a word.  I signed it because I thought he was going to try to get $1,000 an acre for the ground and that he had an offer of $600.  I did not understand that it was an approval of a sale for $600."  She said that, on the next day or the next day after, she heard that he had actually sold the place, and went down to his office and told him that he must not take $600 an acre, and he then informed her that the property was sold.

Complainant offered testimony as follows:

William C. Duvall testified that he was a constable and had occasion to present a claim to Knott and serve him with process in October, 1903.  Had several conversations with him; seemed to be of ordinary intelligence; observed nothing to lead him to believe that he was unable to make a contract.

Isaac E. Shoemaker, of the Miller Shoemaker Company, testified that Mrs. Earnest K. Knott, wife of a nephew of George T. Knott, came to their office and said Mr. Knott wanted them to come up and see him in regard to selling a portion of his property, and the next day sent Mr. Hayes, one of their representatives, to see Knott.

Edgar M. Hayes testifies that he had been employed by the Miller Shoemaker Company in August, 1904, as a salesman, that he went out to Knott's house prior to August 11, 1904; did not see him, but saw Mrs. Davis.  She said he was anxious to sell.  She said something about having been offered once $1,000 an acre, and said, "I know we can't get anything like that now."  Asked if she would place any price on it, she said: "You can ask $1,000 an acre and submit any price you can get."  She said he was compelled to sell the land, because there was a mortgage on it for about $1,900.  Witness went with Mr. Miller to see Knott on August 11th, but sat in the buggy; did not go into the house.

J. Barton Miller, of the Miller Shoemaker Company, testified that, having heard Hayes's report, he began to look for a purchaser.  "Thomas J. Giles offered $600 an acre for so much of the property as was embraced in the part Knott wanted

to sell. We drove up to the side of the house and stopped in front of the door. George T. Knott was coming down towards the door from the stable as we drew up, and as I was getting out he took a seat in the doorway and picked up a newspaper and began to read. Mrs. Knott came to the door and invited me to enter the parlor, which was on the second floor. I went in and was met by Mrs. Davis; told her I desired to see Mr. Knott, as I had come to make an offer on the property. Mr. Knott came upstairs; I told him I had not been able to get $1,000, the price he had been offered once, and the best I could get was $600, and that was a cash offer. They deliberated over it for some time, talked over the matter, and discussed the mortgage, and got me to figure up just what the sale would amount to at $600 per acre. I asked him how much was in there, and he said to the best of his knowledge and belief there were 3½ or 4 acres, and that the whole tract was about 8 acres. They said there was a loan on the property of about $1,900, and upon making a calculation we found there would be enough money to clear the mortgage and leave the home site free of encumbrance. After recalling that he had once been offered $1,000 for the property during the boom, I said that was the time to sell, and he said: 'Yes, I reckon that we made a mistake;' and finally: 'If that is all you can get for it I reckon that we had better take it.' He showed me where I could write, and taking a form from my pocket I wrote an approval of the sale, which was signed by him. There was some general conversation about Knott desiring to save his home for Mrs. Davis, as she had been his housekeeper, etc. Having reported to him the statement made by Mrs. Davis, he said this is not correct. I told him that I had an offer of $600 for the property, and if it was acceptable he should approve the sale in writing. They were both in the room, and sometimes I addressed my conversation to Mrs. Davis and sometimes to Mr. Knott. Mr. Knott discussed the situation very thoroughly, showed me the metes and bounds of the property through the window, spoke about the indebtedness on the property, and his being out of business. His conversation was general. Have not seen Knott since. Mrs. Davis came to my office

next morning, and she said: 'Mr. Miller, that property was sold too cheap, and Mr. Knott wants to recall it.' I told her: 'The property has been sold; we have accepted a deposit on it; the sale has been approved, and the transaction now is closed so far as the approval is concerned. All that remains is for the examination of the title to be made, and the deal finally closed by the passing of the proceeds.' Mrs. Davis said: 'But we have been advised that it has been sold too cheap.' I am uncertain whether she said this on that occasion or on her next visit two or three days later." He observed no peculiarity in Knott on August 11th. "He was as rational and intelligent as I have found any man to be. There was nothing in his conduct to indicate that he was not mentally well balanced. I had not seen him for three or four months before that time, and have not seen him since. Know him very well." It appears from the testimony of this witness that the memorandum accepted by Giles was not written until after witness had returned from Knott's to his office.

Giles testifies that he was a speculator in lands, that he wanted the property because he thought it was a great baergain. It appears from the testimony of this witness that the attorneys were employed for him by the Miller Shoemaker Company, and that the entire matter of the litigation was in their hands. He was not in Washington when the bill was filed. The $100 deposited with the Miller Shoemaker Company he supposes was used by them in paying the costs of the proceeding. It does not appear from the testimony of this witness that he ever saw the particular land. He said that he bought it because it was a great bargain, expecting to make a profit from it, cutting it up a little bit. He said that he considered it worth more than $600, but would not say how much more he thought it was worth, but that was all he was willing to give for it.

After the close of the testimony, the defendants moved for an extension of time to take further testimony, which motion was overruled, and the court entered a decree to the effect that the plea is untrue, that the plaintiff is entitled to specific performance of the contract, and directing the conveyance to be made

upon the payment into court by the plaintiff of the sum of $2,175, the purchase price of the land. Defendants thereupon took this appeal.

*Mr. Joseph W. Cox, Mr. Creed M. Fulton,* and *Mr. A. E. Leckie* for the appellants.

*Mr. Charles Cowles Tucker* and *Mr. J. Miller Kenyon* for the appellee.

Mr. Chief Justice Shepard delivered the opinion of the Court:

We are unable to perceive why the defendants elected to make their defense by way of the plea rather than by demurrer or answer; nevertheless, the evidence offered in support of the plea is very strong. The bill itself alleges that a decree was entered in the same court on September 15, 1904,—a little more than thirty days after the date of the approval of the contract of sale,—declaring the defendant Knott an habitual drunkard, and appointing the defendant Fulton the committee of his person and estate. The record shows that the bill on which this decree was entered was filed August 29, 1904; that service was had thereon, and on September 13, 1904, an order was made referring it to a jury to determine "whether or not the defendant is an habitual drunkard, or user of any drug or compound whatsoever, and by reason thereof is unfit to look after and care for himself and estate properly." The jury having returned a verdict that the defendant was an habitual drunkard and unfit to manage or control his property, the decree was entered thereon. The proceedings throughout followed the requirements of sec. 115f of the Code [32 Stat. at L. 524, chap. 1329].

Under the pleadings and proof, this decree is conclusive of the condition of the defendant Knott on the date of its rendition; it is not so as of a date prior thereto, but at the same time it has the tendency to raise some inference that the helpless condition must have existed for some space of time, at least, for one cannot suddenly become an habitual drunkard and lose

all capacity and legal right to control his own property. Affirmative testimony was introduced by the committee tending to show that Knott had drank excessively for several years, and that prior to July, 1904, as well as in August and September, he was demented. The testimony of his family physician, who had known him twenty years, was quite positive to that effect.

As the testimony of the physician and another neighbor was general, they not having seen and observed the party on the very day that the contract was made, the learned justice who presided at the hearing apparently giving more weight to the evidence of Miller, the agent who effected the sale, than to the foregoing and that of the sister of Knott, who was also present at the time and taking some part in the transaction, denied the truth of the plea. The defendants having offered the plea of mental incapacity, he evidently regarded them as assuming the same burden of proof that is imposed upon one who seeks to obtain the cancelation of a solemnly executed instrument on the ground of mental incapacity or fraudulent practices.

In our view of what will be a just disposition of the appeal, having due regard to the equities of all the parties, we will not undertake to determine the sufficiency of the evidence to sustain the plea. Were we to hold it sufficient, the probable effect would be to deprive the complainant of any remedy at law for breach of the contract; and it is in such an action that the question of capacity at the time of making the contract can be most satisfactorily determined by means of a jury trial.

Having found for the complainant on the plea, the court proceeded to enter the decree upon the bill as if the same had been confessed. That this is the proper practice in ordinary cases of bills for equitable relief, there can be no question. *Adriaans* v. *Lyon,* 8 App. D. C. 532, 536. Taking the bill then as confessed, was the complainant entitled to a decree of specific performance? We think not. According to our practice, as declared by the Supreme Court of the United States, "a decree *pro confesso* is not a decree as of course according to the prayer of the bill, nor merely such as the complainant chooses to take it; but that it is made (or should be made) by the court, according

to what is proper to be decreed upon the statements of the bill, assumed to be true." *Thomson* v. *Wooster,* 114 U. S. 104, 113, 29 L. ed. 105, 108, 5 Sup. Ct. Rep. 788; *Ohio C. R. Co.* v. *Central Trust Co.* 133 U. S. 83, 90, 33 L. ed. 561, 563, 10 Sup. Ct. Rep. 235. Such a decree "admits the facts charged in the bill, but not the conclusions drawn therefrom, nor the conclusions of law." *Perkins* v. *Tyrer,* 24 App. D. C. 447, 456, and cases therein cited.

A bill for specific performance differs from the ordinary bill in equity before referred to. Admitting the facts alleged in such a bill, the conclusion does not necessarily follow that the complainant is entitled to a decree for specific performance as prayed. It is the well-settled doctrine that the jurisdiction of equity is not compulsory, but the subject of discretion. It "does not go as a matter of course, but is granted or withheld according as equity and justice seem to demand in view of all the circumstances of the case." *McCabe* v. *Matthews,* 155 U. S. 550, 553, 39 L. ed. 256, 257, 15 Sup. Ct. Rep. 190; *Willard* v. *Tayloe,* 8 Wall. 557, 565, 19 L. ed. 501, 503. As explained by Mr. Justice Field in the last-named case (p. 567, L. ed. p. 504): "The discretion which may be exercised in this class of cases is not an arbitrary or capricious one, depending upon the mere pleasure of the court, but one which is controlled by the established doctrines and settled principles of equity. No positive rule can be laid down by which the action of the court can be determined in all cases. In general it may be said that the specific relief will be granted when it is apparent, from a view of all the circumstances of the particular case, that it will subserve the ends of justice; and that it will be withheld when, from a like view, it appears that it will produce hardship or injustice to either of the parties. It is not sufficient, as shown by the cases cited, to call forth the equitable interposition of the court, that the legal obligation under the contract to do the specific thing desired may be perfect. It must also appear that the specific enforcement will work no hardship or injustice, for if that result would follow, the court will leave the parties to their remedies at law, unless the granting of the specific relief

can be accompanied with conditions which will obviate that result."

Tested by this rule, the allegations of the bill are not such as to compel the court to exercise its equitable discretion to decree specific performance. A case of hardship is presented that cannot be obviated by any conditions that can be properly imposed. It does not appear that the complainant had any specific object in obtaining the title to the particular land, or that it had any special value in his estimation or for his purposes. Nor is there anything to indicate that he cannot obtain complete and adequate relief at law for any injury that he may have sustained. For these reasons, specific performance is not important to him.

On the other hand, the bill filed on January 27, 1905, shows that within less than twenty days from the date of the contract, an application had been filed to have his vendor declared an habitual drunkard, and that the same ripened into a decree in less than twenty days more. It further shows that an offer to purchase, for $825 per acre, the same land contracted for by him at $600 per acre, had been made to and accepted by the committee, and subsequently, on January 19, 1905, approved by the court. It is manifest, therefore, that a decree for specific performance in this case may work a great hardship upon the defendant Knott; for, while the inadequacy of the consideration is not such as to "shock the conscience," and would not, alone, be sufficient to justify withholding the relief, it is of weight, to that end, in connection with other circumstances indicating hardship. The same may be said in respect of the probable mental incapacity of the defendant suggested by the conditions recited in the bill. The weight of each circumstance is greatly increased by conjunction with the other. *Allore* v. *Jewell,* 94 U. S. 506, 511, 24 L. ed. 260, 263. What is sound doctrine in a case like that for the cancelation of a deed, applies more strongly in defense to a bill for specific performance; because, while strong and conclusive evidence is required to warrant relief by way of cancelation, far less is sufficient to defeat specific performance, and remit the complainant to his remedy at law. In

the former case the decree is conclusive; in the latter it is not; it merely closes the door of equity to the complainant, leaving him free to pursue his remedy at law.

For the reasons given, the decree will be reversed with costs, and the cause remanded with direction to dismiss the bill without prejudice to the right of the complainant to pursue his remedy at law if so advised.   It is so ordered.          *Reversed.*