## THOMSON & Others *v.* WOOSTER.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE SOUTHERN DISTRICT OF NEW YORK.

Argued December 1, 2, 1884.—Decided March 30, 1885.

Under the rules and practice of this court in equity a decree *pro confesso* is not a decree as of course according to the prayer of the bill, nor as the complainant chooses to make it; but it should be made by the court according to what is proper to be decreed upon the statements of the bill, assumed to be true.

The difference between former rules in equity and those now in force pointed out.

Whether, after a bill is taken *pro confesso,* the defendant is entitled to an order permitting him to appear before the master is not now decided.

After entry of a decree *pro confesso,* and while it stands unrevoked, the defendant cannot set up anything in opposition to it, either below, or in this court on appeal, except what appears on the face of the bill.

In a suit in equity to restrain the infringement of a patent and for an account, the defendant cannot question the validity of the patent after a decree *pro confesso* establishing its validity.

A delay in applying for the reissue of a patent which appears on the face of the proceedings, and which, unexplained, might be regarded as unreasonable, cannot be set up against the patent by a defendant after a decree *pro confesso* has been taken in a suit in equity which is founded on and sets up the patent and seeks to restrain him from infringing it.

It is irregular to introduce, pending an appeal, an original patent not introduced below.

Affidavits before a master or the court below as grounds of application to reopen proofs, form no part of the evidence before the court on appeal.

In proceedings before a master, after the bill in a suit to restrain infringement of a patent has been taken *pro confesso,* it is not proper to inquire into the cost of producing a result by other processes or machines; the proper inquiry relates to the profits enjoyed by defendants by reason of using the patented invention.

The appellee in this case, who was complainant below, filed his bill against the appellants, complaining that they infringed certain letters patent for an improved folding guide for sewing machines, granted to one Alexander Douglass, of which the complainant was the assignee. The patent was dated October 5, 1858, was extended for seven years in 1872, and was re-

issued in December, 1872. The suit was brought on the reissued patent, a copy of which was annexed to the bill, which contained allegations that the invention patented had gone into extensive use, not only on the part of the complainant, but by his licensees; and that many suits had been brought and sustained against infringers. The bill further alleged that the defendants, from the time when the patent was reissued down to the commencement of the suit, wrongfully and without license, made, sold and used, or caused to be made, sold and used, one or more folding guides, each and all containing the said improvement secured to the complainant by the said reissued letters patent, and that the defendants derived great gain and profits from such use, but to what amount the complainant was ignorant, and prayed a disclosure thereof, and an account of profits, and damages, and a perpetual injunction.

The bill of complaint was accompanied with affidavits verifying the principal facts and certain decrees or judgments obtained on the patent against other parties, and Douglass's original application for the patent, made in April, 1856, a copy of which was annexed to the affidavits. These affidavits and documents were exhibited for the purpose of obtaining a preliminary injunction, which was granted on notice.

The defendants appeared to the suit by their solicitor, May 3, 1879, but neglected to file any answer, or to make any defence to the bill, and a rule that the bill be taken *pro confesso* was entered in regular course June 10, 1879. Thereupon, on the 2d of August, 1879, after due notice and hearing, the court made a decree to the following effect, viz.: 1st. That the letters-patent sued on were good and valid in law: 2d. That Douglass was the first and original inventor of the invention described and claimed therein: 3d. That the defendants had infringed the same by making, using and vending to others to be used, without right or license, certain folding guides substantially as described in said letters patent: 4th. That the complainant recover of the defendants the profits which they had derived by reason of such infringement by any manufacture, use or sale, and any and all damages which the complainant had sustained thereby; and it was referred to a master to take

and state an account of said profits, and to assess said damages, with directions to the defendants to produce their books and papers and submit to an oral examination if required. It was also decreed that a perpetual injunction issue to restrain the defendants from making, using, or vending any folding guides made as theretofore used by them, containing any of the inventions described and claimed in the patent, and from infringing the patent in any way.

Under this decree the parties went before the master, and the examination was commenced in October, 1879, in the presence of counsel for both parties, and was continued from time to time until November 3, 1880, when arguments were heard upon the matter, and the case was submitted. On November 12th the report was prepared and submitted to the inspection of counsel. On the 18th motion was made by the defendants' counsel, before the master, to open the proofs and for leave to introduce newly discovered evidence. This motion was supported by affidavits, but was overruled by the master, and his report was filed December 10, 1880, in which it was found and stated that the defendants had used at various times, from January 18, 1877, to the commencement of the suit, twenty-seven folding guides infringing the complainant's patent, and had folded 1,217,870 yards of goods by their use, and that during that period there was no means known or used, or open to the public to use, for folding such goods in the same, or substantially the same manner, other than folding them by hand, and that the saving in cost to the defendants by using the folding guides was three cents on each piece of six yards, making the amount of profit which the complainant was entitled to recover, $6,089.35 ; and that during the same period the complainant depended upon license fees for his compensation for the use of the patented device, and that the amount of such fees constituted his loss or damage for the unauthorized use of his invention : and that, according to the established fees, the defendants would have been liable to pay for the use of the folding guides used by them during the years 1877, 1878 and 1879 (the period covered by the infringement), the sum of $1,350, which was the amount of the complainant's

damages. The evidence taken by the master was filed with his report.

By a supplemental report, filed at the same time, the master stated the fact of the application made to him to open the proofs on the ground of surprise and newly discovered evidence (as before stated), and that after hearing said application upon the affidavits presented (which were appended to the report), he was unable to discover any just ground therefor.

The defendants did not object to this supplemental report, but on the 10th of January, 1881, they filed exceptions to the principal report, substantially as follows :

1. That instead of the double guide or folder claimed in the complainant's patent being the only means for folding cloth or strips on each edge during the period of the infringement (other than that of folding by hand), the master should have found that such strips could have been folded by means of a single guide or folder, and that the use of such guides was known and open to the public long before 1877, and that such guides were not embraced in the complainant's patent.

2. That the amount of profits found by the master was erroneous, because it appeared that folded strips such as those used by the defendants were an article of merchandise, cut and folded by different parties at a charge of 25 cents for 144 yards.

3. That the profits should not have been found greater than the saving made by the use of the double guide as compared with the use of a single guide, or greater than the amount for which the strips could have been cut and folded by persons doing such business.

4. That the damages found were erroneous.

Other exceptions were subsequently filed, but were overruled for being filed out of time.

Before the argument of the exceptions the defendants gave notice of a motion to the court to refer the cause back to the master to take further testimony in reference to the question of profits and damages chargeable against them under the order of reference. In support of this motion further affidavits were presented.

The exceptions to the report and the application to refer the cause back to the master were argued together. The court denied the motion to refer the cause back, overruled the exceptions to the report, and made a decree in favor of the complainant for the profits, but disallowed the damages. That decree the respondents brought here by appeal.

They assigned fourteen reasons for appeal, of which the first nine related to the proceedings before the master and his report, and the last five to the validity of the reissued patents.

*Mr. J. Q. Clayton* and *Mr. A. Q. Keasbey* for appellants.—
On the points relating to the invalidity of the patent, and their right to question it after the bill had been taken *pro confesso*, they contended that many defences had been entertained in this court, either *sua sponte*, or upon argument here, although not made in the court below, nor contained in the pleadings: notably the defence of lack of invention, or non-patentability. *Brown* v. *Piper*, 91 U. S. 37; *Slawson* v. *Grand Street Railroad Co.*, 107 U. S. 649. The decree below being a decree by default, as *pro confesso*, and not a consent decree, this defence is open, though the issue was not tendered below. Even a consent decree may be appealed from. *Pacific Railroad Co.* v. *Ketcham*, 101 U. S. 289. There can be no doubt that anything appearing upon the record which would have been fatal upon a motion in arrest of judgment, is equally fatal on a writ of error. *Slocum* v. *Pomery*, 6 Cranch. 221. See also *McAllister* v. *Kuhn*, 96 U. S. 87. Having, then, the right to raise the question here, it is claimed (1) That the reissue was invalid because it was for different and other inventions than the one described in the original patent. (2) That it is invalid because it is unlawfully expanded after unreasonable delay, more than fourteen years having elapsed between the grant of the original patent and the filing of the application for a reissue. See *Miller* v. *Brass Co.*, 104 U. S. 350; *James* v. *Campbell*, 104 U. S. 356; *Bantz* v. *Frantz*, 105 U. S. 160; *Turner & Seymour Mfg. Co.* v. *Dover Stamping Co.*, 111 U. S. 319. All these cases were decided after the appeal in this cause. They established a new rule of law, requiring reasonable diligence,

and clearly show that complainant's reissue granted fourteen years and two months after date of original patent is void as to these defendants. If it be objected that the original patent was not offered in evidence below, appellants should be allowed to file it here, which they offer to do. (3) The reissue was invalid because the thing patented lacked invention. *Dunbar* v. *Myers*, 94 U. S. 187. (4) The bill avers that during the fourteen years of the original term of the patent the validity of said letters patent was established in numerous suits in the Circuit Courts of the United States, and that all persons sued took licenses and paid therefor, as well as many others, not sued. Thereby averring, in substance, that the original letters patent were valid and operative. The original letters patent having been thus valid and operative, as averred by complainant, for over fourteen years, no reissue thereafter could be legally obtained, because invalidity or inoperativeness are conditions precedent to the grant of a reissue. See *Whiteley* v. *Swayne*, 4 Fish. 117, 123 ; *Wicks* v. *Stevens*, 2 Ban. & A. 318 ; *Giant Powder Co.* v. *Vigorit Powder Co.*, 6 Sawyer, 508 ; *Flower* v. *Rayner*, 5 Fed. Rep. 793 ; *Searls* v. *Bouton*, 12 Fed. Rep. 625.

*Mr. Frederic H. Betts* for appellee.

MR. JUSTICE BRADLEY delivered the opinion of the court. After stating the facts in the foregoing language, he continued :

The appellants have assigned fourteen reasons or grounds for reversing the decree. The first nine relate to the taking of the account before the master and his report thereon ; the last five relate to the validity of the letters patent on which the suit was brought. It will be convenient to consider the last reasons first.

The bill, as we have seen, was taken *pro confesso*, and a decree *pro confesso* was regularly entered up, declaring that the letters patent were valid, that Douglass was the original inventor of the invention therein described and claimed, that the defendants were infringing the patent, and that they must

account to the complainant for the profits made by them by such infringement and for the damages he had sustained thereby ; and it was referred to a master to take and state an account of such profits and to ascertain said damages.

The defendants are concluded by that decree, so far at least as it is supported by the allegations of the bill, taking the same to be true. Being carefully based on these allegations, and not extending beyond them, it cannot now be questioned by the defendants unless it is shown to be erroneous by other statements contained in the bill itself. A confession of facts properly pleaded dispenses with proof of those facts, and is as effective for the purposes of the suit as if the facts were proved; and a decree *pro confesso* regards the statements of the bill as confessed.

By the early practice of the civil law, failure to appear at the day to which the cause was adjourned was deemed a confession of the action; but in later times this rule was changed, so that the plaintiff, notwithstanding the contumacy of the defendant, only obtained judgment in accordance with the truth of the case as established by an *ex parte* examination. Keller, Proced. Rom. § 69. The original practice of the English Court of Chancery was in accordance with the later Roman law. *Hawkins* v. *Crook*, 2 P. Wms. 556. But for at least two centuries past bills have been taken *pro confesso* for contumacy. *Ibid.* Chief Baron Gilbert says : "Where a man appears by his clerk in court, and after lies in prison, and is brought up three times to court by habeas corpus, and has the bill read to him, and refuses to answer, such public refusal in court does amount to the confession of the whole bill. Secondly, when a person appears and departs without answering, and the whole process of the court has been awarded against him after his appearance and departure, to the sequestration; there also the bill is taken *pro confesso*, because it is presumed to be true when he has appeared and departs in despite of the court and withstands all its process without answering." Forum Romanum, 36. Lord Hardwicke likened a decree *pro confesso* to a judgment by *nil dicit* at common law, and to judgment for plaintiff on demurrer to the defendant's plea. *Davis* v. *Davis*,

2 Atk. 21. It was said in *Hawkins* v. *Crook, qua supra,* and quoted in 2 Eq. Ca. Ab. 179, that " The method in equity of taking a bill *pro confesso* is consonant to the rule and practice of the courts at law, where, if the defendant makes default by *nil dicit,* judgment is immediately given in debt, or in all cases where the thing demanded is certain.; but where the matter sued for consists in damages, a judgment interlocutory is given; after which a writ of inquiry goes to ascertain the damages, and then the judgment follows." The strict analogy of this proceeding in actions of law to a general decree *pro confesso* in equity in favor of the complainant, with a reference to a master to take a necessary account, or to assess unliquidated damages, is obvious and striking.

A carefully prepared history of the practice and effect of taking bills *pro confesso* is given in *Williams* v. *Corwin,* Hopkins Ch. 471, by Hoffman, master, in a report made to Chancellor Sanford, of New York, in which the conclusion come to (and adopted by the Chancellor), as to the effect of taking a bill *pro confesso,* was that " when the allegations of a bill are distinct and positive, and the bill is taken as confessed, such allegations are taken as true without proofs," and a decree will be made accordingly; but " where the allegations of a bill are indefinite, or the demand of the complainant is in its nature uncertain, the certainty requisite to a proper decree must be afforded by proofs. The bill, when confessed by the default of the defendant, is taken to be true in all matters alleged with sufficient certainty; but in respect to matters not alleged with due certainty, or subjects which from their nature and the course of the court require an examination of details, the obligation to furnish proofs rests on the complainant."

We may properly say, therefore, that to take a bill *pro confesso* is to order it to stand as if its statements were confessed to be true; and that a decree *pro confesso* is a decree based on such statements, assumed to be true, 1 Smith's Ch. Pract. 153, and such a decree is as binding and conclusive as any decree rendered in the most solemn manner. " It cannot be impeached collaterally, but only upon a bill of review, or [a bill]

to set it aside for fraud.　1 Daniell Ch. Pr. 696, 1st Ed.; *
*Ogilvie* v. *Herne,* 13 Ves. 563.

Such being the general nature and effect of an order taking
a bill *pro confesso*, and of a decree *pro confesso* regularly made
thereon, we are prepared to understand the full force of our
rules of practice on the subject.　Those rules, of course, are to
govern so far as they apply; but the effect and meaning of the
terms which they employ are necessarily to be sought in the
books of authority to which we have referred.

By our rules a decree *pro confesso* may be had if the de-
fendant, on being served with process, fails to appear within
the time required; or if, having appeared, he fails to plead,
demur or answer to the bill within the time limited for that
purpose; or, if he fails to answer after a former plea, demurrer
or answer is overruled or declared insufficient.　The 12th Rule
in Equity prescribes the time when the subpœna shall be made
returnable, and directs that " at the bottom of the subpœna
shall be placed a memorandum, that the defendant is to enter
his appearance in the suit in the clerk's office on or before the
day at which the writ is returnable; otherwise the bill may be
taken *pro confesso*."　The 18th Rule requires the defendant to
file his plea, demurrer or answer (unless he gets an enlarge-
ment of the time) on the rule day next succeeding that of en-

---

* *Note by the Court.*—Reference is made to the 1st Edition of Daniell (pub.
1837) as being, with the 2d Edition of Smith's Practice (published the same
year), the most authoritative work on English Chancery Practice in use in
March, 1842, when our Equity Rules were adopted.　Supplemented by the
General Orders made by Lords Cottenham and Langdale in August, 1841
(many of which were closely copied in our own Rules), they exhibit that
"present practice of the High Court of Chancery in England," which by our
90th Rule was adopted as the standard of equity practice in cases where the
Rules prescribed by this court, or by the Circuit Court, do not apply.　The 2d
Edition of Mr. Daniell's work, published by Mr. Headlam in 1846, was much
modified by the extensive changes introduced by the English Orders of May
8, 1845; and the 3d Edition, by the still more radical changes introduced by
the Orders of April, 1850, the Statute of 15 & 16 Vict. c. 86, and the General
Orders afterwards made under the authority of that statute.　Of course, the
subsequent editions of Daniell are still further removed from the standard
adopted by this court in 1842; but as they contain a view of the later decisions
bearing upon so much of the old system as remains, they have, on that ac-
count a value of their own, provided one is not misled by the new portions.

tering his appearance; and in default thereof the plaintiff may at his election, enter an order (as of course) in the order book, that the bill be taken *pro confesso*, and thereupon the cause shall be proceeded in *ex parte*, and the matter of the bill may be decreed by the court at any time after the expiration of thirty days from the entry of said order, if the same can be done without an answer, and is proper to be decreed ; or the plaintiff, if he requires any discovery or answer to enable him to obtain a proper decree, shall be entitled to process of attachment against the defendant to compel an answer, etc. And the 19th Rule declares that the decree rendered upon a bill taken *pro confesso* shall be deemed absolute, unless the court shall at the same term set aside the same, or enlarge the time for filing the answer, upon cause shown upon motion and affidavit of the defendant.

It is thus seen that by our practice, a decree *pro confesso* is not a degree as of course according to the prayer of the bill, nor merely such as the complainant chooses to take it; but that it is made (or should be made) by the court, according to what is proper to be decreed upon the statements of the bill, assumed to be true. This gives it the greater solemnity, and accords with the English practice, as well as that of New York. Chancellor Kent, quoting Lord Eldon, says : " Where the bill is thus taken *pro confesso*, and the cause is set down for hearing, the course (says Lord Eldon, in *Geary* v. *Sheridan*, 8 Ves. 192,) is for the court to hear the pleadings, and itself to pronounce the decree, and not to permit the plaintiff to take, at his own discretion, such a decree as he could abide by, as in the case of default by the defendant at the hearing." *Rose* v. *Woodruff*, 4 Johns. Ch. 547, 548. Our rules do not require the cause to be set down for hearing at a regular term, but, after the entry of the order to take the bill *pro confesso*, the 18th rule declares that thereupon the cause shall be proceeded in *ex parte*, and *the matter of the bill may be decreed by the court* at any time after the expiration of thirty days from the entry of such order, if it can be done without answer, *and is proper to be decreed.* This language shows that the matter of the bill ought at least to be opened and explained to the court when

the decree is applied for, so that the court may see that the decree is a proper one. The binding character of the decree, as declared in Rule 19, renders it proper that this degree of precaution should be taken.

We have been more particular in examining this subject because of the attempt made by the defendants, on this appeal, to overthrow the decree by matters outside of the bill, which was regularly taken *pro confesso*. From the authorities cited, and the express language of our own Rules in Equity, it seems clear that the defendants, after the entry of the decree *pro confesso*, and whilst it stood unrevoked, were absolutely barred and precluded from alleging anything in derogation of, or in opposition to, the said decree, and that they are equally barred and precluded from questioning its correctness here on appeal, unless on the face of the bill it appears manifest that it was erroneous and improperly granted. The attempt, on the hearing before the master, to show that the reissued patent was for a different invention from that described in the orig'nal patent, or to show that there was such unreasonable delay in applying for it as to render it void under the recent decisions of this court, was entirely inadmissible because repugnant to the decree. The defendants could not be allowed to question the validity of the patent which the decree had declared valid. The fact that the reissue was applied for and granted fourteen years after the date of the original patent would, undoubtedly, had the cause been defended and the validity of the reissued patent been controverted, been strongly presumptive of unreasonable delay; but it might possibly have been explained, and the court could not say as matter of law, and certainly, under the decree of the court, the master could not say, that it was insusceptible of explanation. And on this appeal it is surely irregular to question the allegations of the bill. If anything appears in those allegations themselves going to show that the decree was erroneous, of course it is assignable for error; but any attempt to introduce facts not embraced in those allegations, for the purpose of countervailing the decree, is manifestly improper. The introduction of the original patent, pending the appeal, was clearly irregular.

The appellants have called attention to one matter in the allegations of the bill on which they rely for the purpose of showing that, as matter of law, the reissued patent must be void. It is stated in their 10th assignment of error, as follows:

"10th. For that, on the face of the bill and the patent, the reissued patent in suit was illegally granted, and therefore void, and the court should have so held ; and this court is now asked to so hold, because the bill avers that during the fourteen years of the original term of the patent the validity of said letters patent was established in numerous suits in the Circuit Courts of the United States, and that all persons sued took licenses and paid therefor, as well as many others not sued, thereby averring, in substance, that the original letters patent were *valid* and *operative :*

"Wherefore, appellants ask this court to hold that the original letters patent having been *valid* and *operative*, as averred by complainant, for over fourteen years, no reissue thereafter could be legally obtained, because *invalidity* or *inoperativeness* are conditions precedent to the grant of a reissue."

The answer to this assignment is obvious. The suits brought on the original patent may have been for infringements committed against particular parts of the invention, or modes of using it and putting it into operation, as to which the specification was clear, full and sufficient ; whilst, at the same time, there may have been certain other parts of the invention, or modes of using it and putting it into operation, as to which the specification was defective or insufficient, and which were not noticed until the application for reissue was made ; or, in the original patent the patentee may have claimed as his own invention more than he had a right to claim as new—a mistake which might be corrected at any time. At all events, the court cannot say, as mere matter of law, that this might not have been the case.

We think that the objection to the decree going to the validity of the patent, and the whole cause of action, cannot be sustained.

We are then brought to the proceedings in taking the account. The errors assigned on this part of the case are based on the exceptions taken to the master's report, which have already been noticed. They resolve themselves into two principal grounds of objection : *First*, that the master allowed the complainant all the profits made by the defendants by the use of the patented machine in folding cloths and strips, as compared with doing the same thing by hand ; whereas he should only have allowed the profits of using the complainant's patented machine as compared with a single folder, which the defendants allege was open to the public before their infringement commenced. *Secondly*, that the master, in allowing profits, took no account of the fact that folded strips, such as those used by the defendants, were an article of merchandise, cut and folded by different parties at a charge of only 25 cents for 144 yards, or about one-sixth of a cent per yard; whereas the defendants were charged with a profit of one-half of a cent per yard.

As to the first of these objections, it is to be observed, first, that no evidence was produced before the master to show that, during the period of the infringement, there was open to the public the use of any machine for folding a single edge, which was adapted to the work done by the defendants. The only evidence adduced for that purpose was the letters patent granted to S. P. Chapin, February 19, 1856, and the letters patent granted to J. S. McCurdy, dated February 26, 1856. No evidence was introduced to show that the folding guides described in those patents were adapted to the folding of strips for corsets, which was the work required by the defendants, and for which they used the complainant's invention. On the contrary, it was proved by the positive testimony of the complainant (and not contradicted), that the Chapin device could not be used for folding strips of materials on one or both edges for use upon corsets," for reasons fully detailed in the testimony ; and that "the McCurdy device is a binder calculated and adapted to fold selvaged edged goods, such as ribbon and braid, and will fold the strip passing through it in the center only," "and cannot be used for folding raw-edged strips of cloth

either on one or both edges." The complainant also testified that there was no other way known to him (and he testified that he had large experience on the subject) to do work like that done by the defendants, except by hand, or in the use of another patent owned by him, namely, the Robjohn patent, dated April 19, 1864 (which was produced in evidence), which consisted of a folding guide, folding one edge in combination with a device for pressing said fold to an edge, and then passing said folded strip through a narrower folder, folding the other edge, and pressing said fold by a pressing device. No evidence was adduced by the defendants to contradict this testimony.

It is proper to remark here that the affidavits presented to the master, and those afterwards presented to the court, as grounds of the respective applications to reopen the proofs, cannot be looked into on this hearing. They form no part of the evidence taken before the master on the reference; and no error is assigned (even if error could be assigned) to the refusal of the court to refer the case back to the master for the purpose of taking further testimony.

The second objection to the report is, that the master, in estimating the profits chargeable to the defendants, did not take into account the fact that folded strips, such as those used by the defendants, were an article of merchandise, cut and folded by different parties at a charge of only 25 cents for 144 yards. To this objection it may be observed, that the evidence before the master did not show by what process such folded strips were made, nor whether they were not really made by infringing the complainant's patent. As the proof stood before the master, they must have been made by the use of the complainant's machine, for there was no other known machine by which they could have been made at any such cost. And if made by the use of complainant's machine, the inference must be that the persons making them were infringing the complainant's patent, for they are not named in the list of those to whom the complainant had granted licenses, which list was presented before the master at the defendant's request. If made by such infringement they can hardly be set up against the complainant to reduce the amount of profits made by the

defendants. There is something singular about this part of the case. If folded strips, suitable for the defendants' purpose, could have been procured in the market by them at such a low price as is pretended, why did they not procure them in that way after being enjoined against using the complainant's machine, instead of making them by the disadvantageous method of using a single folder and folding one edge at a time? Was it from a knowledge of the fact that the persons who folded such strips were infringing the complainant's patent, and a consequent unwillingness to become further complicated in such infringements? At all events, since the defendants chose to make their own folded strips in their own factory, instead of going outside to purchase them, or have them made by others, they cannot justly complain of being accountable for the profits realized in using the complainant's machine for that purpose. It might have been a better financial operation to have bought of others, or employed others to make the folded strips which they required, just as, in the case of the Cawood patent, the railroad company would have done better not to have mended the ends of their battered rails, but to have had them cut off; but as they chose to perform the operation they became responsible to the patentee for the advantage derived from using his machine. *Cawood Patent*, 94 U. S. 695, 710. We do not think that the objection is well taken.

It follows that all the reasons of appeal must be overruled.

No error, or ground of appeal, is assigned upon the refusal of the court below to refer the cause back to the master for the purpose of re-opening the proofs, although some observations on that point are submitted in the brief of the appellants. We think that that matter was fairly addressed to the discretion of the court, and cannot properly be made the ground of objection on this appeal. New evidence, discovered after the hearing before the master is closed, may, in proper cases, be ground for a bill of review, on which issue may be joined and evidence adduced by both parties in the usual way. The defendants are not concluded by the refusal of the court, on mere affidavits, to refer the cause back to the master. An examination, however, of the affidavits presented to the court,

does not convince us that a farther inquiry should have been ordered.

In thus considering the case on its merits, as presented by the evidence taken before the master, his report thereon, and the exceptions to such report, we have deemed it unnecessary to make any remarks as to the *status* of a defendant before a master on a reference under a decree *pro confesso.* Both parties in this case seem to have taken for granted that the rights of the defendants were the same as if the decree had been made upon answer and proofs. In the English practice, it is true, as it existed at the time of the adoption of our present Rules (in 1842), the defendant, after a decree *pro confesso* and a reference for an account, was entitled to appear before the master and to have notice of, and take part in, the proceedings, provided he obtained an order of the court for that purpose, which would be granted on terms. 2 Daniell Ch. Pr. 804, 1st Ed.; Ditto. 1358, 2d Ed. by Perkins; *Heyn* v. *Heyn*, Jacob, 49. The former practice in the Court of Chancery of New York was substantially the same. 1 Hoffman Ch. Pr. 520; 1 Barb. Ch. Pr. 479. In New Jersey, except in plain cases of decree for foreclosure of a mortgage, (where no reference is required), the matter is left to the discretion of the court. Sometimes notice is ordered to be given to the defendant to attend before the master, and sometimes not; as it is also in the Chancellor's discretion to order a bill to be taken *pro confesso* for a default, or to order the complainant to take proofs to sustain the allegations of the bill. Nixon Dig., Art. Chancery, § 21; Gen. Orders in Chancery, XIV., 3–7; *Brundage* v. *Goodfellow*, 4 Halst. Ch. 513.

As we have seen, by our 18th Rule in Equity it is provided, that if the defendant make default in not filing his plea, demurrer or answer in proper time, the plaintiff may, as one alternative, enter an order as of course that the bill be taken *pro confesso*, " *and thereupon the cause shall be proceeded in ex parte.*" The old Rules, adopted in 1822, did not contain this *ex parte* clause; they simply declared that if the defendant failed to appear and file his answer within three months after appearance day, the plaintiff might take the bill for confessed,

and that the matter thereof should be decreed accordingly; the decree to be absolute unless cause should be shown at the next term. See Equity Rules VI. and X. of 1822, 7 Wheat. vii, and *Pendleton* v. *Evans*, 4 Wash. C. C. 335; *O'Hara* v. *Mc-Connell*, 93 U. S. 150. Under these rules the English practice was left to govern the subsequent course of proceeding, by which, as we have seen, the defendant might have an order to permit him to appear before the master, and be entitled to notice. Whether under the present rule a different practice was intended to be introduced is a question which it is not necessary to decide in this case.

*The decree of the Circuit Court is affirmed.*