**Kevin D. BERTRAM, Appellant,**

v.

**WFI STADIUM, INC., Appellee.**

**No. 11–CV–0396.**

District of Columbia Court of Appeals.

Submitted Jan. 31, 2012.

Decided April 26, 2012.

---

George R. Pitts and Jeffrey Rhodes, Washington, DC, were on the brief, for appellant.

Geoffrey S. Gavett, Rockville, MD, was on the brief, for appellee.

Before THOMPSON and EASTERLY, Associate Judges, and FERREN, Senior Judge.

THOMPSON, Associate Judge:

In September 2010, appellee WFI Stadium, Inc. ("the Stadium") sued appellant Kevin Bertram, asserting a claim of "fraudulent conveyance." After Bertram failed to answer either the Stadium's September 2010 initial Complaint or its November 2010 Amended Complaint, the Superior Court entered a default against him.

Thereafter, the court held a hearing limited to the issue of damages and, at the conclusion of the hearing, entered a judgment against Bertram for $1,883,230.70. In this appeal, Bertram argues that the court erred in entering the judgment against him because (1) the Stadium's complaint failed to allege the elements of a fraudulent transfer under the Uniform Fraudulent Transfer Act ("UFTA")[1] and otherwise failed to state a claim; and, in any event, (2) the court heard no evidence, and made no finding, that the value of the property alleged to have been fraudulently transferred was at least equal to the amount of the $1,883,230.70 judgment. Rejecting Bertram's first argument, but discerning some merit in the second, we affirm in part, reverse in part, and remand.

## I. Background

At all times relevant to this appeal, Bertram was the Chief Executive Officer and majority owner of Distributive Networks, Inc. ("Distributive"). In October 2009, the Stadium obtained a Maryland judgment against Distributive on the basis of Distributive's failure to pay as promised for an executive suite and associated amenities at FedEx Field for Washington Redskins football games for the 2007–2016 seasons. On July 9, 2010, the Stadium filed its Maryland judgment against Distributive in the Superior Court.[2] The Stadium subsequently learned, however, that Distributive had conveyed all of its property to a company called ArX Mobile, Inc. ("ArX"). The Stadium then filed the instant litigation against Bertram individually, in an effort to hold him liable for the amount of the Maryland judgment against Distributive.

---

1. D.C.Code §§ 28–3101 to –3111 (2001).

2. *See* Super. Ct. Civ. R. 72.

The Stadium's theory of liability was based on the following facts: In April 2009, while the Stadium was pursuing its collection efforts against Distributive in Maryland, Bertram, on behalf of Distributive, signed an agreement pursuant to which a group of lenders (the "Lenders") loaned Distributive $2 million and took as collateral a security interest in all of Distributive's property. The $2 million loan was also secured by Bertram's personal guarantee. In April 2009, the Lenders filed with the Delaware Secretary of State a copy of the Uniform Commercial Code financing statement describing the security interest. Thereafter, Distributive defaulted on the loan, and the Lenders sued both Distributive and Bertram, in his capacity as guarantor, in order (according to the Stadium's Amended Complaint) "to recover the outstanding amount of the Loan and/or to recover collateral securing the Loan." In May 2010 (months after the Stadium had obtained its Maryland judgment against Distributive), the Lenders, Distributive, and Bertram agreed to settle that lawsuit by entering into an "Asset Transfer and Collateral Acceptance Agreement," signed around the end of July 2010 (the "July 2010 Settlement Agreement" or the "Agreement"). Pursuant to that Agreement, Distributive surrendered to ArX, an entity created by the Lenders, substantially all of Distributive's property, and three other entities (of which Bertram also was CEO) likewise transferred specified assets to ArX, in full satisfaction of Distributive's debt to the Lenders and Bertram's obligation as guarantor.[3]

The Stadium alleged in its Amended Complaint that Bertram personally benefitted from Distributive's entry into the Agreement, in that the Agreement provided for a release of his personal liability as guarantor; that the Agreement impaired the Stadium's ability to enforce its judgment against Distributive; and that Bertram agreed to and effected the surrender of Distributive's property with the intent to hinder, delay, or defraud the Stadium.

As already described, Bertram failed to file an answer, and a default was entered against him. On February 18, 2011, the Superior Court held an evidentiary hearing on damages. During the hearing, at which Bertram appeared without counsel, the Stadium presented evidence that Distributive had defaulted on its agreement to pay for the Redskins season tickets; that the Stadium had obtained a Maryland judgment on the debt in the amount of $1,883,230.70; that the Maryland judgment was filed in the Superior Court; that Bertram was the sole member and manager of Distributive; and that, upon entry into the Agreement to surrender substantially all of Distributive's property to the Lenders' designee, Bertram had assured that he would benefit by obtaining from the Lenders a release of his liability as

---

3. The Stadium's initial Complaint had named ArX as an additional defendant, and the July 2010 Settlement Agreement was attached as an exhibit to ArX's motion to dismiss that Complaint. Since the Agreement is referenced as well in the Stadium's Amended Complaint (which the Stadium eventually dismissed as to both ArX and the Lenders, whom that complaint had added as defendants, after ArX again moved for dismissal), we consider it to be part of the pleadings for purposes of our analysis of whether the Amended Complaint stated a claim. *See Chamberlain v. Am. Honda Fin. Corp.*, 931 A.2d 1018, 1025 (D.C. 2007) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.") (citation and internal quotation marks omitted). The Agreement listed as "Transferring Entities" not only Distributive, but also Distributive Networks Holdings, LLC, Tusk Mobile, LLC, and Constituent Mobile, LLC, and it specified the accounts receivable and client contracts that these entities agreed to transfer. Bertram signed the Agreement on behalf of each of these entities in his capacity as CEO.

guarantor of a $2 million loan to Distributive. Upon that evidence, the court granted judgment in favor of the Stadium and against Bertram in the amount of $1,883,230.70. This appeal followed.

## II. Analysis

### A. The Default Judgment as to Liability

 Bertram relies on our case law establishing that before the trial court may enter a default judgment, it must satisfy itself that the complaint describes a basis for liability. *See Elmore v. Stevens,* 824 A.2d 44, 46 (D.C.2003) (reversing default judgment that had been entered on the basis of a "woefully inadequate" complaint); *Hudson v. Ashley,* 411 A.2d 963, 968 (D.C.1980) ("[A] defendant's default does not in itself warrant the court in entering a default judgment. There must be a sufficient basis in the pleadings for the judgment entered.") (citation and internal quotation marks omitted); *see also City of New York v. Mickalis Pawn Shop, LLC,* 645 F.3d 114, 137 n. 23 (2d Cir.2011) ("Most of our sister circuits appear to have held expressly that a district court may not enter a default judgment unless the plaintiff's complaint states a valid facial claim for relief.") (collecting cases). Bertram argues that, notwithstanding the Amended Complaint's legal assertion that he is liable for "fraudulent conveyance," the complaint failed to plead the required elements of a claim of fraudulent transfer under the UFTA.[4]

 We agree with Bertram that we may not uphold the judgment against him if the Stadium's complaint failed to state a facially valid claim for relief. However, for the reasons that follow, we are unpersuaded by his argument that the Amended Complaint was fatally deficient.[5]

---

**4.** As the Stadium points out in its brief, it did not assert in the Amended Complaint that its claim was based on the UFTA (although the initial Complaint did allege that ArX had "successor liability based upon fraudulent conveyance" under D.C.Code § 28–3104). Courts have not been uniform in their reasoning about whether the UFTA supersedes common-law causes of action for fraudulent conveyance. *Compare Cavadi v. DeYeso,* 458 Mass. 615, 941 N.E.2d 23, 35 (2011) (reasoning that the UFTA is neither "an exclusive law on the subject of voidable transfers and obligations,") (quoting Comment 2 to UFTA § 1, 7A (Part II) U.L.A. 16 (Master ed.2006)), nor "a complete or exclusive law covering fraudulent transfers and obligations" (quoting Frank R. Kennedy, *The Uniform Fraudulent Transfer Act,* 18 UCC L.J. 195, 200 (1986)) (further citation and internal quotation marks omitted), *Fleet Nat'l Bank v. Valente (In re Valente),* 360 F.3d 256, 261 (1st Cir.2004) (describing the "desire by the drafters [of the UFTA] to preserve the common law as a supplement to the UFTA unless precluded by the terms of the Act," and "reject[ing] the proposition that the adoption of the UFTA by a state preempts all common law remedies," including equitable remedies), *and Missal v. Alexander,* No. 97–2691(TFH), 1999 U.S. Dist. LEX-

IS 10833, at *7 n. 3 (D.D.C. July 6, 1999) (reasoning that it was not necessary to decide whether a receiver's fraudulent conveyance claim fell within the UFTA since "substantial ... common law ... provide[d] sufficient basis for" the receiver's claims), *with Moore v. Browning,* 203 Ariz. 102, 50 P.3d 852, 858 (Ct.App.2002) (The "UFTA has displaced any common law cause of action for fraudulent conveyance...."). *See also* D.C. Council, Report on Bill 11–228, the "Uniform Fraudulent Transfer Act of 1995", at 6 (June 23, 1995) ("Judiciary Committee Report") (stating, under the heading "Impact on Existing Law," that "common law cases, to the extent that they are in conflict with the UFTA would no longer be applicable"). We conclude that this case does not require us to wade into this debate; that is, we need not consider whether the Stadium's Amended Complaint stated a viable common-law fraudulent conveyance claim or other non-UFTA claim, because, as discussed in the text that follows, we are satisfied that it stated a claim at least under the UFTA.

**5.** In determining whether the Amended Complaint stated a claim, we have followed the approach that would have applied if Bertram had responded to the Stadium's complaint by

The Council of the District of Columbia adopted the UFTA in 1995, with an effective date of February 9, 1996.[6] In enacting it, the Council understood that it would provide for "more complete creditor remedies" and would "bring the law in the District more in conformity with federal bankruptcy law, which provides remedies for fraudulent transfers." Judiciary Committee Report at 1, 2.[7] In pertinent part, the UFTA provides that:

> (a) A transfer made, or obligation incurred, by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor[.]

D.C.Code § 28–3104(a)(1). Bertram's primary argument as to why the Stadium's Amended Complaint was deficient is that (1) to state a claim under § 28–3104(a)(1),

the Stadium was required to plead that its debtor, Distributive, made a "transfer" of "an asset or an interest in an asset"[8] with the intent to hinder, delay, or defraud the Stadium as creditor; but (2) the allegations of the Amended Complaint are about the surrender of property in which the Lenders had a perfected security interest, property that did not constitute an "asset" within the meaning of the UFTA. See D.C.Code § 28–3101(2)(A) (providing that the term "asset" does not include "property to the extent it is encumbered by a valid lien").

■ Bertram's argument is valid as far as it goes, but what it overlooks is that a creditor can also state a claim under § 28–3104(a)(1) by alleging that its debtor "incurred [an] obligation … [w]ith actual intent to hinder, delay, or defraud" the creditor. The Amended Complaint's assertions about Distributive's entry into the July 2010 Settlement Agreement appear to constitute just such an allegation. The UFTA does not contain a definition of "obligation,"[9] but, as defined in BLACK's

---

filing a motion to dismiss for failure to state a claim: we have "review[ed] the allegations of the complaint in the light most favorable to [the Stadium as] the nonmoving party," *Mamo v. District of Columbia*, 934 A.2d 376, 387 (D.C.2007), and asked whether the Stadium's complaint "state[d] a claim to relief that [was] plausible on its face," i.e., "plead[ed] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation and internal quotation marks omitted). *See also Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C.2011) (citing *Iqbal* and "interpret[ing] Superior Court Rule 8(a) to include [the same] plausibility standard").

**6.** The UFTA superseded a District of Columbia statute known as the Uniform Fraudulent Conveyance Act of 1995 (the "UFCA"). *See Roberts & Lloyd, Inc. v. Zyblut*, 691 A.2d 635, 638 n. 3 (D.C.1997).

**7.** *See also, e.g., Levit v. Spatz (In re Spatz )*, 222 B.R. 157, 164 (N.D.Ill.1998) ("Because the provisions of the UFTA parallel § 548 of

the Bankruptcy Code, findings made under the Bankruptcy Code are applicable to actions under the UFTA.") (citation omitted).

**8.** D.C.Code § 28–3101(12).

**9.** The typical example of an "obligation" of the sort contemplated by the law of fraudulent transfers appears to be the debtor's having agreed to pay or guarantee a third party's debt, without having received equivalent value. *See, e.g., Commerce Bank v. Achtenberg*, No. 90–0950–CV–W–6, 1993 WL 476510, at *1, *2, 1993 U.S. Dist. LEXIS 16136, at *2, *4 (W.D.Mo. Nov. 10, 1993) (bankruptcy case in which the court found that "within one year before commencement of debtors' bankruptcy proceedings, debtors each incurred an obligation to Commerce [Bank] by guaranteeing [a third-party company's] debt to Commerce in the amount of $7 million," without receiving reasonably equivalent value in exchange for the personal guarantees; the court ruled that the guarantee "obligations are avoidable as constructive fraudulent transfers").

LAW DICTIONARY 1104 (8th ed.2004), the term includes "anything that a person is bound to do or forbear from doing, whether the duty is imposed by law [or] *contract* [.]" (italics added). In addition, the focus of the UFTA and the parallel provisions of the Bankruptcy Code is on transactions, including contracts or other obligations, that "deplete[ ] the debtor's estate," *In re Montgomery*, 983 F.2d 1389, 1394 (6th Cir. 1993), making it "unavailable to other creditors." *In re Crystal Med. Prods., Inc.*, 240 B.R. 290, 297 (Bankr.N.D.Ill. 1999). The allegations of the Amended Complaint are about Distributive's entry into a contract (the Agreement) that changed the situation from one in which the Lenders were suing to enforce Bertram's personal guarantee, to one in which Distributive surrendered substantially all of the loan collateral in exchange for a release of Bertram's personal guarantee, with the result of diminishing the amount of Distributive's property that might have remained available to unsecured creditors and hindering the Stadium's collection efforts.[10] Specifically, the Amended Complaint alleged that Distributive, acting through Bertram, "agree[d] to transfer substantially all of the valuable assets belonging to Distributive to Lender Defendants or their assignee" while knowing "at the time of entering into the ... Agreement" that "such assets were encumbered by [the Stadium's] Judgment against Distributive"; that Bertram "personally benefitted from the transfer of assets from Distributive to ArX as Bertram received the release of personal liability· by the Lender[s]"; and that these actions were "intentional, willful [and] malicious," and were taken "with the intent to defraud the [Stadium]." We are satisfied that these allegations sufficed to state a claim under the UFTA that the debtor Distributive incurred an obligation—an agreement to surrender specified collateral in exchange for a release of the majority shareholder's personal guarantee of Distributive's debt— with the intent to hinder, delay, or defraud the Stadium as creditor.[11] We find support for this conclusion in the many cases in which courts have considered claims that a debtor company, acting through its majority owner/CEO, undertook a transaction that resulted in release of the owner/CEO's personal guarantee of the com-

10. The record is largely silent about what happened to the $2 million in loan proceeds. The Amended Complaint does aver, "[u]pon information and belief," that the loan was "not a 'purchase money loan' utilized by Distributive to acquire specific equipment, inventory, or other assets." But, apparently, the money had been spent in some other way and was not in the corporate till: the Amended Complaint alleged that ArX acquired "all of the substantially valuable assets of Distributive," and an attachment to the Agreement described the surrendered collateral as including "[c]ash in all Transferor bank accounts," which, for Distributive, was listed as $218.22.

11. It might be objected that, because the Lenders held a security interest in Distributive's property as collateral for the $2 million loan, the Agreement was not an additional "obligation" that could be deemed fraudulent under the UFTA. We would disagree. The Lenders' security interest entitled them to foreclose upon the collateral in the event of Distributive's default, but did not obligate Distributive to turn over selected property to ArX through a "friendly foreclosure," *EEOC v. SWP, Inc.*, 153 F.Supp.2d 911, 921 (N.D.Ind. 2001), or to surrender items of collateral in conjunction with asset transfers by other entities of which Bertram was CEO, rather than leave the Lenders to continue pursuing their lawsuit against guarantor Bertram. *Cf. Foley & Lardner v. Biondo (In re Biondo )*, 180 F.3d 126, 133 (4th Cir.1999) (reasoning that the settlement agreement in issue was "a separate, identifiable refinancing transaction" since it "required Foley & Lardner voluntarily to dismiss the suits that were pending against the Biondos" and "effectively substituted a new debt obligation for the previously existing debt").

pany's debt, and have allowed the claims to proceed under the UFCA or the UFTA or have voided the transactions under the Bankruptcy Code.[12]

Bertram contends that the Amended Complaint is deficient as a UFTA complaint because, while it makes allegations about his intent, it does not plead that the *debtor*, Distributive, acted with the actual intent to hinder or defraud its creditor. This argument is unavailing. "[I]ntent . . . may be averred generally." Super. Ct. Civ. R. 9(b). Since the complaint averred that Bertram at all relevant times was the "Chief Executive Officer and majority owner" of Distributive and that, acting in that capacity, he executed the Agreement with the intent to defraud the Stadium, we are satisfied that the Amended Complaint sufficiently alleged that Distributive, too, acted with fraudulent intent. We also reject Bertram's argument that the complaint's allegations about his intent to hinder, delay, or defraud are unsupported conclusions rather than well-pleaded allegations of the type necessary to support a default judgment. *See Oliver v. Mustafa*, 929 A.2d 873, 878 (D.C.2007) (explaining that a defendant in default "is not held to admit facts that are not well-pleaded") (citations and internal quotation marks omit-

ted). The Stadium's allegations of Bertram's intent to hinder were "alleged with sufficient certainty," *Thomson v. Wooster*, 114 U.S. 104, 111, 5 S.Ct. 788, 29 L.Ed. 105 (1885), and thus were well-pleaded. Moreover, the Amended Complaint alleged facts that the UFTA lists as "badges of fraud."[13] *See* D.C.Code § 28–3104(b)(1)(11) ("In determining actual intent [to hinder, delay, or defraud a creditor], consideration may be given" to factors such as whether there was a transfer benefitting an insider of the debtor, whether the debtor had been sued or threatened with suit before the transfer was made, and whether the transfer was of substantially all the debtor's assets); *see also In re Tax Reduction Inst.*, 148 B.R. 63, 73 (Bankr.D.D.C.1992) ("The existence of a guarantee of the debt by the debtor's president is a relevant consideration in determining whether a [transfer to the creditor holding that debt] was made in bad faith . . . .").

 Bertram also argues that a claim that Distributive intended to hinder, delay, or defraud the Stadium cannot be premised on an allegation that it agreed to surrender, to the Lenders' designee, property in which the Lenders already had a

---

**12.** *See, e.g., Voest–Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 212, 219 (3d Cir.1990) (UFCA case noting that personal guarantees previously given by the individuals who controlled the debtor company "were reduced or canceled in conjunction with the conveyance of the [company's] assets"; and rejecting the argument that no claim was stated because the company's lender was contractually entitled to foreclose, reasoning that absent the owners' initiative, the lender would not have chosen to foreclose on the collateral); *Permasteelisa CS Corp. v. Airolite Co.*, No. 2:06–CV–569, 2007 WL 4615779, at *7 n. 3, 2007 U.S. Dist. LEXIS 95860, at *18 n. 3 (S.D.Ohio Dec. 31, 2007) (denying summary judgment to defendant corporate president on fraudulent transfer claim brought under the UFTA, where the

debtor corporation sold its assets and used the proceeds to pay off a corporate loan that was guaranteed by the president; reasoning that "it could certainly be argued that the transfer was made for his benefit. He sought to sell [the debtor's] assets so that he could pay off the debt to People's Bank and avoid being personally liable on the loan."); *Nat'l City Bank of Minneapolis v. Lapides (In re Transcolor Corp.)*, 296 B.R. 343, 372 (Bankr. D.Md.2003) (corporate owner orchestrated fraudulent transfer of the assets and "personally reaped the benefits from the transfer by eliminating the liability of his wife and himself on their personal guarantees").

**13.** *Janvey v. Alguire*, 647 F.3d 585, 603 n. 10 (5th Cir.2011) (citation and internal quotation marks omitted).

perfected security interest, and upon which they were already entitled to foreclose to protect their rights. We disagree. As explained in note 11 *supra,* the Agreement entailed a new obligation. In addition, as we have previously recognized, even if a debtor has at least one nonfraudulent motive for a transaction, the additional motive of effecting the transaction to hinder a creditor "is a sufficient ground for an unassailable conclusion [of] ... fraudulent intent." *Consumers United Ins. Co. v. Smith,* 644 A.2d 1328, 1359 (D.C.1994).

The remaining deficiency in the complaint, according to Bertram, is that while the UFTA is targeted at fraudulent conduct by a debtor, the Stadium did not sue its debtor Distributive, but instead sued Bertram, who was not the Stadium's debtor. However, the Stadium's choice of Bertram as defendant did not cause its complaint to fail to state a claim under the UFTA. The UFTA expressly permits judgments against "the person for whose benefit the transfer [by the debtor] was made." D.C.Code § 28–3108(b)(1). We think it must be read also to permit judgments against the person for whose benefit an "obligation [was] incurred [by the debtor]" if the obligation was "fraudulent as to a creditor." D.C.Code § 28–3104(a). As alleged in the Amended Complaint, Bertram is such a person, since, under his direction and by his hand, Distributive "[under]took" an "obligation" that relieved him of liability and that (although it may have been "for reasonably equivalent value") was not "in good faith" (but instead was for the purpose of hindering Distributive's creditor). *See* D.C.Code § 28–3108(a); *see also Bonded Fin. Servs. Inc.*

*v. European Am. Bank,* 838 F.2d 890, 895 (7th Cir.1988) (explaining that the "paradigm 'entity for whose benefit such transfer was made' is a guarantor," i.e., "someone who receives the benefit but not the money" when a transaction is accomplished to satisfy the loan indebtedness and the guarantor no longer is exposed to liability).

Moreover, applying the UFTA, courts have held that where an individual who controlled a debtor company participated in the decision to make a fraudulent conveyance and did so with an intention to hinder the company's creditor(s), the individual "may be held liable for the fraudulent conveyance." *Firstar Bank, N.A. v. Faul,* No. 00–C–4061, 2001 WL 1636430, at *6–7, 2001 U.S. Dist. LEXIS 21294, at *17–21 (N.D.Ill. Dec. 19, 2001) (rejecting the argument that the fraudulent conveyance count, brought against defendant who was the majority shareholder in the transferor/debtor company, must be dismissed, reasoning that "Illinois law permits a cause of action for fraud against any party who participates in a fraud, ... and ... see[ing] no reason not to extend this rule to fraudulent conveyances"); [14] *see also Permasteelisa CS Corp.,* No. 2:06–CV–569, 2007 WL 4615779, 2007 U.S. Dist. LEXIS 95860 (S.D.Ohio Dec. 31, 2007) (denying summary judgment to defendant corporate president in case alleging a fraudulent conveyance of assets by the corporation in violation of the UFTA); *cf. Voest–Alpine Trading USA Corp. v. Vantage Steel Corp.,* 919 F.2d 206, 211, 217 (3d Cir.1990) (UFCA case upholding judgment against individuals who had 100% control of the debtor corporation and in that capacity

---

**14.** *See also DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.,* 384 F.3d 338, 347–48 (7th Cir.2004) (citing *Firstar* with approval, and reasoning that while courts in a number of cases had rejected "novel claims of accessory, conspiracy or aiding and abetting liability" under the UFTA by lawyers or other agents who helped facilitate transfers, no case had suggested that officers or shareholders of a company who personally participated in a fraudulent scheme are immune from liability under the UFTA).

had "engineered [its] fraudulent conveyance of assets," and noting that under Pennsylvania law, "liability will attach to a corporate officer who participates in the wrongful acts of the corporation") (citations omitted).

 Similar to the common law in the jurisdictions cited above, the case law in our jurisdiction establishes that "[c]orporate officers are personally liable for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation." *Lawlor v. District of Columbia,* 758 A.2d 964, 974, 977 (D.C.2000) (noting that "[a]n officer's liability is not based merely on the officer's position in the corporation; it is based on the officer's behavior and whether that behavior indicates that the tortious conduct was done within the officer's area of affirmative official responsibility and with the officer's consent or approval"; and that "[l]iability must be premised upon a corporate officer's meaningful participation in the wrongful acts") (citations and internal quotation marks omitted).[15] For this reason, too, we reject Bertram's argument

that a UFTA suit did not lie against him individually.

We also note that while the remedial provisions of the UFTA are focused primarily on following and reaching "assets" in the hands of transferees that have participated in the fraudulent scheme, or on recovering value from persons who have benefitted from the transfer of "assets" to such transferees [16] (remedies that were not available on the facts pled here),[17] the statute also provides more generally for "[a]ny other relief the circumstances may require." D.C.Code § 28–3107(a)(3)(C). Courts have held that this UFTA "catch-all" provision "empower[s] a court to provide monetary relief at its discretion" (and does not authorize only equitable remedies such as avoidance, attachment, an injunction, or appointment of a receiver). *DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.,* 384 F.3d 338, 353 (7th Cir.2004) (collecting cases). We are satisfied that the catch-all provision afforded a basis for the Stadium to sue Bertram "[i]n an action for relief against a[n] ... obligation under this

---

**15.** *See also Gambone v. Lite Rock Drywall,* 288 Fed.Appx. 9, 14 (3d Cir.2008) (stating that fraudulent conveyance "is a species of the intentional tort of fraud"); *Fudali v. Pivotal Corp.,* No. 03–1460(JMF), 2011 WL 1576611, at *4–5, 2011 U.S. Dist. LEXIS 44559, at *11–12 (D.D.C. Apr. 26, 2011) (referring to the "tort" of fraudulent transfer of assets).

**16.** *See, e.g.,* D.C.Code § 28–3108(b)(1) (providing that "the creditor may recover judgment ... against: (1) The first transferee of the asset or the person for whose benefit the transfer was made"); D.C.Code § 28–3107(a)(1), (2) (authorizing "[a]voidance of the transfer" or a "provisional remedy against the asset transferred or other property of the transferee").

**17.** As already discussed, the collateral that Distributive surrendered to ArX was encumbered and thus, to the extent of the encumbrance, did not constitute "assets" within the meaning of the UFTA. D.C.Code § 28–

3101(2)(A). Also, the remedy of voiding a transfer is not available "against a person who took in good faith and for a reasonably equivalent value." D.C.Code § 28–3108(a). Here, the Amended Complaint did not allege that the Lenders or ArX acted in bad faith by knowingly assisting in efforts to hinder the Stadium or any other creditor of Distributive. The Amended Complaint did allege that ArX "either failed to conduct due diligence in the form of searching the judgment records of Maryland and the District" prior to entering into the Agreement or "willfully refused to inquire into such judgments." However, it also acknowledged that, through the Agreement, the Lenders had required Distributive to disclose all liabilities and litigation pending against it (which Distributive failed to do). In addition, it contained no allegation that the Lenders or ArX took the collateral for something other than "reasonably equivalent value."

chapter," D.C.Code § 28–3107(a), on the basis of his role in causing Distributive to agree to surrender collateral to ArX pursuant to the Agreement.

In light of all the foregoing, we conclude that, taken as true, the allegations of the Amended Complaint were sufficient to state a claim under the UFTA. They did more than "permit the [trial] court to infer ... the mere possibility of misconduct"; they "plausibly g[a]ve rise to an entitlement to relief." *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Had Bertram answered the complaint and the matter proceeded to trial (or even to a point where summary judgment was sought), Bertram might well have been able to rebut, or the Stadium might have failed to adduce sufficient evidence to prove, the complaint's allegation of fraudulent intent; or, Bertram may have been able to establish other facts demonstrating that he should not be held liable. Those possibilities, however, do not afford us a basis for disturbing the default that the court entered upon Bertram's failure to answer.

## B. The Judgment as to Damages

■ Bertram's final argument is that the value of the collateral that Distributive agreed to surrender to ArX was "far less than the amount of [the Stadium's] claim," that the Stadium did not prove otherwise, and that the court made no determination of the value of the surrendered collateral and had no basis for finding that the value supported a judgment in Stadium's favor for the full $1,883,230.70 that it sought.[18] Bertram premises his argument on the

UFTA's remedial standard, i.e., that "the creditor may recover judgment for the value of the asset transferred ... or the amount necessary to satisfy the creditor's claim, whichever is less." D.C.Code § 28–3108(b).

At the damages hearing, Bertram asked no questions and presented no evidence about the value of the collateral, so we have no basis for accepting his argument that the value was "far less" than the amount of the Stadium's claim. On the other hand, as described earlier, the Agreement required not only that Distributive surrender property to ArX, but also that other Bertram-controlled companies transfer property to ArX to fully satisfy the debt to the Lenders. This suggests that the value of the collateral surrendered by Distributive was significantly less than $2 million (even if it was not, as Bertram claims, "far less" than $1,883,230.70). At the same time, although the Stadium did not present an appraisal or other estimate of the value of the surrendered collateral, it presented sufficient evidence (in the form of a copy of the Agreement, which listed many items of Distributive's property, including the dollar amounts of surrendered accounts receivable) to support a finding that the surrendered property had *some* value, which should be the measure of the Stadium's recovery (up to $1,883,230.70).

We agree with Bertram that if the collateral he caused Distributive to surrender pursuant to the Agreement had a value of less than $1,883,230.70, the Stadium was entitled to a judgment in only that lesser

---

**18.** The Stadium's Amended Complaint did not allege a definite value of the collateral that Distributive surrendered to ArX; to the contrary, it alleged "a case or controversy as to the value of the subject assets." Therefore, Bertram cannot be deemed to have made an admission as to value when he failed to answer the complaint. *See Thomson v. Wooster,*

114 U.S. 104, 111, 5 S.Ct. 788, 29 L.Ed. 105 (1885) ("[T]he default of the defendant[ ] is taken to be true in all matters alleged with sufficient certainty; but in respect to matters not alleged with due certainty ..., the obligation to furnish proofs rests on the complainant.") (internal quotation marks omitted).

amount.[19] We conclude that the appropriate course is to remand to the trial court to conduct such further proceedings as may be necessary to make a finding as to the value of the collateral that Distributive surrendered to ArX, and, if the court finds that the value was less than $1,883,230.70, to reduce the amount of the judgment accordingly.

Accordingly, we affirm the judgment as to liability, reverse the judgment as to the amount of damages, and remand the matter to the trial court for further proceedings consistent with this opinion.

*So ordered.*

---

19. We agree with Bertram that, notwithstanding his failure to object, at the close of the evidence in the bench trial, to the Stadium's failure to present proof of its actual damages, he is entitled to challenge now the sufficiency of the evidence of damages. *See* Super. Ct. Civ. R. 52(b) ("When findings of fact are made in actions tried without a jury, the sufficiency of the evidence supporting the findings may be later questioned whether or not the party raising the question objected to the findings, moved to amend them, or moved for partial findings.").

We reject, however, Bertram's argument that the Stadium "could not have been damaged" by the surrender of collateral because Distributive "did not have any equity in the assets." This argument misses the point, which is that if Bertram had honored his personal guarantee of Distributive's debt to the Lenders, Distributive's property (presumably) would have become unencumbered and thus available to be applied to satisfy the Stadium's Maryland judgment.