# IN THE COURT OF APPEALS OF IOWA

No. 17-0104
Filed June 20, 2018

**ZANE ALGREEN,**
    Plaintiff-Appellee,

**vs.**

**TIMOTHY GARDNER and GARDNER CROP INSURANCE, INC.,**
    Defendants-Appellants.

_____

Appeal from the Iowa District Court for Monroe County, Randy S. DeGeest and Lucy J. Gamon, Judges.

Litigants challenge the finding of a fraudulent transfer and subsequent piercing of the corporate veil. **REVERSED AND REMANDED**.

John A. Pabst of Pabst Law Office, Albia, for appellants.

Andrew L. LeGrant of LeGrant Law Firm, P.C., Urbandale, for appellee.

Heard by Doyle, P.J., and Tabor and McDonald, JJ.

**MCDONALD, Judge.**

This consolidated appeal concerns two separate but related actions initiated by Zane Algreen against Timothy Gardner and Gardner Crop Insurance, Inc. (GCI). The first action involved a claim for unpaid wages arising under the Iowa Wage Payment Collection Law, Iowa Code chapter 91A (2012). In that suit, Algreen obtained judgment against GCI in the amount of $19,770.05 for unpaid compensation, $2337.32 for liquidated damages, and $46,292.89 for attorney fees and expenses. In the second action, Algreen sought equitable relief against Gardner and GCI for the failure to pay the judgment in the first action. Algreen asserted a claim for fraudulent conveyance, arising under Iowa Code chapter 684 (2016), and sought to pierce the corporate veil. The district court granted Algreen's petition, held Gardner would be held jointly and severally liable for the judgment in the first case, awarded punitive damages in the amount of $22,107.37 against Gardner and GCI, and directed Algreen to submit a supplemental attorney-fee affidavit in the wage-payment case for the award of additional attorney fees and costs incurred in collecting the judgment. After Algreen submitted the affidavit, the district court awarded an additional $22,202.18 in attorney fees and costs in the wage-payment case. Gardner and GCI timely filed this appeal.

I.

The record reflects the following. GCI was in the business of selling multiple peril crop insurance and hail insurance policies. Gardner was the founder and owner-operator of GCI. He founded the company in 2001. Gardner owned 87% of the company stock, and he served as the company's president, secretary, treasurer, and director. Gardner's son owned the minority share of the company.

Algreen commenced employment with GCI in May 2011. At that time, Algreen was married to Gardner's sister. But when the marriage ended in 2012, so did Algreen's employment. Algreen believed GCI owed him base-wages and commissions at the time of his termination. When Algreen informed Gardner he expected payment, Gardner told him, "You'll never see another dime."

Approximately one year later, in April 2013, Gardner began negotiating the sale of GCI to CGB Diversified Services, Inc. In February 2014, Gardner and CGB Diversified finalized the terms of the agreement. CGB Diversified purchased GCI's book of insurance business for a maximum of $1.8 million pursuant to a payment schedule with the final purchase price dependent on the revenue produced from the book of business. CGB Diversified also agreed to employ Gardner as a sales agent with Gardner being subject to a non-compete and non-disclosure agreement. GCI thus ceased operations at that time. CGB Diversified was to pay the purchase price in a series of installment payments, with each installment to be split 87% to Gardner and 13% to the minority shareholder in GCI. The first installment of $360,000 was paid at the time of closing. Additional installment payments have been made in the amounts of $313,200; $307,388; $310,954; and $311,160.

In September 2013, after Gardner had commenced negotiation to sell his business to CGB Diversified, Algreen filed his action to collect unpaid wages. In April 2015, following a jury trial, the district court entered judgment against GCI in the amount of $19,770.05 for unpaid compensation, $2337.32 for liquidated damages, and $46,292.89 for attorney fees and expenses. The date of the

judgment entry is more than one year after Gardner sold his business to CGB Diversified.

After the entry of the judgment, Algreen began unsuccessful efforts to collect on the judgment against the now-defunct business. A writ of general execution was issued in September 2015 but was returned unsatisfied. Algreen unsuccessfully attempted to garnish GCI in November 2015. In March 2016, Algreen filed an application to levy execution pursuant to Iowa Code section 684.7(2). GCI resisted, and the matter was litigated. Algreen then withdrew his section 684.7(2) application and elected to file an independent action alleging fraudulent transfer of assets. Another writ of execution was issued but returned unsatisfied, and Algreen's second attempt to garnish GCI was also unsuccessful.

Algreen filed his petition for equitable relief asserting a claim of fraudulent transfer against Gardner and GCI in May 2016. He asked the court to pierce the corporate veil and hold Gardner and GCI jointly and severally liable for the full amount of the judgment in the wage-dispute action. He also asserted he was entitled to an award of punitive damages because Gardner and GCI acted with malice or reckless indifference to his rights. The fraudulent-transfer matter was tried to the bench. The district court concluded Algreen proved his fraudulent transfer claim and proved the corporate veil should be pierced. The court awarded punitive damages in the amount of $22,107.37—an award equal to the amount of damages awarded by the jury in the wage-dispute suit. The district court held Gardner and GCI jointly and severally liable for the full amount of judgment in the wage-dispute action and for the punitive damage award. The court also ordered Algreen to submit a supplemental application for attorney's fees and expenses in

the wage-dispute action and held Gardner and GCI jointly and severally liable for any such fees and expenses awarded. Gardner and GCI's motion to amend and enlarge findings of fact and conclusions of law was denied. Gardner and GCI appeal.

II.

We first address Algreen's fraudulent-transfer claim arising under Iowa Code chapter 684. Gardner and GCI contend there is insufficient evidence supporting the fraudulent-transfer claim. This case was tried in equity, and our review is de novo. *See* Iowa R. App. P. 6.907. We give weight to the district court's factual findings, especially those involving credibility determinations, but we are not bound by them. *See* Iowa R. App. P. 6.904(3)(g). We examine the entire record and adjudicate anew the rights of the parties on the issues presented. *See City of Wapello v. Chaplin*, 507 N.W.2d 187, 188 (Iowa Ct. App. 1993). At the time this action was filed, the party alleging a fraudulent transfer had the burden of proving the claim by clear and convincing evidence. S*ee Ralfs v. Mawry*, 586 N.W.2d 369, 373 (Iowa 1998) (addressing burden); 2016 Iowa Acts ch. 1040 (codified as amended at Iowa Code § 684.4(3) (Supp. 2016)) (amending section 684.4 to state the burden of proving the elements of the claim is a preponderance of the evidence).

The Uniform Fraudulent Transfer Act (UFTA), Iowa Code chapter 684, governs fraudulent transactions. The UFTA sets forth two types of fraudulent transfer: those transfers made with "actual intent to hinder, delay, or defraud any creditor of the debtor" and those made without reasonably equivalent value for the transfer. Iowa Code § 684.4(1). Only the first type of claim is at issue in this

proceeding. "When a debtor disposes of property with the intent to delay or defraud creditors, we deem the disposition inequitable and will set it aside." *Benson v. Richardson*, 537 N.W.2d 748, 756 (Iowa 1995). "The rationale for the right to reclaim fraudulently conveyed property is, and always has been, to prevent a debtor from frustrat[ing] his creditor's rights and avoid[ing] his obligations by changing title to his assets." *Schaefer v. Schaefer*, 795 N.W.2d 494, 498 (Iowa 2011).

Iowa Code section 684.4(2) sets forth the factors to be considered in determining actual intent. Those factors, also referred to at times as "indicia of fraud" or "badges of fraud," include:

> a. Whether the transfer or obligation was to an insider.
> b. Whether the debtor retained possession or control of the property transferred after the transfer.
> c. Whether the transfer or obligation was disclosed or concealed.
> d. Whether, before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
> e. Whether the transfer was of substantially all the debtor's assets.
> f. Whether the debtor absconded.
> g. Whether the debtor removed or concealed assets.
> h. Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
> i. Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
> j. Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.
> k. Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

Iowa Code § 684.4(2). These factors or badges of fraud "are circumstances that so frequently accompany fraudulent transfers that their presence gives rise to an

inference of intent. The test is whether there is a satisfactory explanation for the circumstance." 37 Am. Jur. 2d *Fraudulent Conveyances and Transfers* § 12 (2001). As the supreme court has recognized, "[t]he circumstances of a bona-fide transaction are ordinarily consistent with each other and with generally recognized business methods and fair dealing, and not incredible. A fraudulent transaction naturally begets stilted, contradictory, and incredible evidence. The bona-fide transaction and the fraudulent one each has its well-recognized indicia." *Rouse v. Rouse*, 174 N.W.2d 660, 667 (Iowa 1970).

The district court concluded Algreen established the sale of GCI's assets to CGB Diversified was a fraudulent conveyance. In support of its conclusion the transaction was made for the purpose of hindering or delaying Algreen's collection efforts, the district court found the following indicia of fraud: Gardner was aware of Algreen's wage-payment suit prior to the sale, the transfer involved all of the GCI's assets, and GCI was insolvent following the sale to CGB Diversified. The district court also found further evidence of fraudulent intent. Most notably, the district court relied on Gardner's statement that Algreen would "never see another dime" and noted Gardner's personal spite and disdain for Algreen. The district court found Gardner's contempt for Algreen evidenced his actual intent to hinder collection on the judgment.

On de novo review, we conclude there is insufficient evidence to establish a fraudulent transfer within the meaning of the statute. The district court failed to place the transaction into context. Gardner commenced negotiation of the sale of his business in April 2013, prior to the time he had notice of any suit for unpaid wages. The sale was completed in February 2014, more than one year prior to

the entry of judgment in the wage case. The sale was to a legitimate third party and was for substantial value. The conclusion that Gardner divested himself of his business worth $1.8 million to avoid the possibility of paying a $20,000 wage claim is not supported by the record and defies common sense. The transaction at issue appears to be nothing more than a routine asset-purchase agreement transacted by an owner-operator looking for an exit.

The district court's failure to place the transaction into context taints its findings with respect to the indicia of fraud. It is unsurprising that GCI sold all of its assets, was technically insolvent, and was a mere shell without employees or any legitimate business operations. While the sale was structured as an asset-purchase agreement rather than a stock-purchase agreement, the entirety of the business was still sold to a third party with the intent GCI be closed. *See Ranniger v. Iowa Dept. of Revenue and Fin.*, 746 N.W.2d 267, 268 (Iowa 2008) (finding for Internal Revenue Code purposes the "sale of a business means the sale of all or substantially all of the tangible personal property or service of the business.") Indeed, as part of the asset-purchase agreement, Gardner was to be employed by CGB Diversified subject to a non-competition agreement precluding him from operating a similar business. At best, the record reflects Algreen's inability to collect against the defunct business was but a happy consequence of the sale of the business, at least as far as Gardner was concerned.

In sum, Algreen failed to prove by clear and convincing evidence the sale of GCI's book of insurance business to CGB Diversified was done with the actual intent to hinder or delay Algreen's collection of his claim against GCI. The evidence reflects the sale of GCI's book of insurance business to CGB Diversified

was nothing more than a routine business transaction. Because we find Algreen failed to prove Gardner committed a fraudulent transfer, any award of damages and fees stemming from this claim is necessarily vacated. This includes the punitive damage award. We reverse the district court on this claim and remand for dismissal of the claim.

III.

Gardner next challenges the district court's decision to pierce the corporate veil and hold him jointly and severally liable for the judgment in the wage-dispute action. We begin with background.

It has been long accepted a corporation is a legal entity with jural existence separate and distinct from its shareholders. *See* Iowa Code § 4.1(20) (defining a person to include a corporation); *Wyatt v. Crimmins*, 277 N.W.2d 615, 616 (Iowa 1979). It has been long accepted a corporation's shareholders are not personally liable for the obligations of the corporation solely because of their status as shareholders. *See* Iowa Code § 490.622(2) ("Unless otherwise provided in the articles of incorporation, a shareholder of a corporation is not personally liable for the acts or debts of the corporation."); 5 Matthew Doré, *Iowa Practice Series: Business Organizations* § 15.3(1), at 454 (2014–2015) (stating limited liability is the presumptive rule). It also has been long accepted courts will disregard the presumptive rule of limited liability under exceptional circumstances and impose liability on an individual or individuals for what would otherwise be a corporate obligation. *See Wade & Wade v. Cent. Broad. Co.*, 288 N.W. 441, 443 (Iowa 1939).

While the rule allowing for the imposition of personal liability on a shareholder for a corporate obligation is long accepted, the rationale underlying the rule is not well developed. *See* 5 Doré, *Iowa Practice* § 15:3, at 458 ("In Iowa, as elsewhere, it is difficult to make sense of the case law governing disregard of the corporate entity."); Mark A. Olthoff, *Beyond the Form—Should the Corporate Veil be Pierced?*, 64 UMKC L.Rev. 311, 312 (1995) ("Courts and commentators have struggled for many years to develop principles that, when applied, would reveal whether a separately existing corporate organization should be disregarded."); Robert B. Thompson, *Piercing the Corporate Veil: An Empirical Study*, 76 Cornell L.Rev. 1036, 1036 (1991) ("Piercing the corporate veil is the

most litigated issue in corporate law and yet it remains among the least understood."). Our cases speak only in metaphor and generalities, holding the "corporate veil can be pierced" when the corporation is a "mere shell," "sham," "intermediary," "instrumentality," or "alter ego" of the shareholders. "This language is inherently unsatisfactory since it merely states the conclusion and gives no guide to the considerations that lead a court to decide that a particular case should be considered an exception to the general principle of nonliability." Robert W. Hamilton, *The Corporate Entity*, 49 Tex. L.Rev. 979, 979 (1971). Ultimately, the issue "is one that is still enveloped in the mists of metaphor." *Berkey v. Third Ave. Ry. Co.*, 155 N.E. 58, 61 (N.Y.1926).

The metaphor of piercing the corporate veil has incorrectly framed the relevant question. *See id.* ("Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it."). Our cases treat the question of "veil piercing" as if it were a cause of action proved by evidence of one or more of the following:

> 1) the corporation is undercapitalized, (2) the corporation lacks separate books, (3) its finances are not kept separate from individual finances, or individual obligations are paid by the corporation, (4) the corporation is used to promote fraud or illegality, (5) corporate formalities are not followed, or (6) the corporation is a mere sham.

*See C. Mac Chambers Co., Inc. v. Iowa Tae Kwon Do Acad., Inc.*, 412 N.W.2d 593, 598 (Iowa 1987). The metaphor does not capture the truth or spirit of the matter. In a veil piercing case, the "corporate veil" is not actually pierced and the corporate entity is not disregarded; instead, judgment is entered against the corporation, as the judgment entry in this case reflects, and the district court takes the additional step of imposing judgment against a shareholder for the corporation's liability where liability otherwise would not exist. *See Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 736 (7th Cir.2004) ("Piercing the corporate veil, after all, is not itself an action; it is merely a procedural means of allowing liability on a substantive claim.").

*Minger Constr., Inc. v. Clark Farms, Ltd.*, No. 14-1404, 2015 WL 7019046, at *4–

5 (Iowa Ct. App. Nov. 12, 2015) (McDonald J., dissenting).

The district court found Algreen proved this is one of the exceptional circumstances in which liability should be imposed upon a shareholder for a judgment entered against the corporation. In support of its conclusion, the district court noted GCI is now undercapitalized, is merely a shell without any assets or employees, and Gardner used corporate funds for certain personal expenses. We cannot agree Algreen established a case for personal liability here. The district court simply failed to view the transaction in the relevant context.

There is no evidence supporting a finding GCI was undercapitalized. *See Briggs Transp. Co., Inc. v. Starr Sales Co., Inc.*, 262 N.W.2d 805, 810 (Iowa 1978) (identifying undercapitalization as a relevant factor). The relevant inquiry is the capital structure of the entity at or near the time of incorporation. *See Minger Constr., Inc.*, 2015 WL 7019046, at *9; *Gilleard v. Nelson*, No. 03–1496, 2005 WL 2756042, at *3 (Iowa Ct. App. Oct. 26, 2005) (affirming imposition of liability on individual where entity "was undercapitalized at its moment of incorporation"); *Midwest Fuels, Inc. v. JP & K, Inc.*, No. 03–0218, 2004 WL 358291, at *2 n.1 (Iowa Ct. App. Feb. 27, 2004) (recognizing the relevant inquiry is "initial capitalization of the corporation"); *see also Global Credit Servs., Inc. v. AMISUB (Saint Joseph Hosp.), Inc.*, 508 N.W.2d 836, 839 (Neb. 1993) ("Inadequate capitalization means capitalization very small in relation to the nature of the business of the corporation and the risks the business entails measured at the time of formation."); *Pierson v. Jones*, 625 P.2d 1085, 1087 (Idaho 1981) (finding "financial inadequacy is measured by the nature and magnitude of the corporate undertaking or the reasonableness of the cushion for creditors at the time of its inception of the corporation"). "Clearly, a corporation adequately capitalized at its inception can

become undercapitalized at a later time for any of a variety of legitimate reasons." *Pierson*, 625 P.2d at 1087. Here, there is no evidence GCI was undercapitalized at the time of its formation. We can infer the opposite from the record. GCI was a legitimate business and operated successfully over a decade to the extent that its book of business was sold for approximately $1.8 million. In addition, there is a legitimate reason the corporate entity had no capital at the time of trial—it was no longer in business. There is no longer any corporate undertaking requiring capital. *See Barrett v. Cont'l Ill. Nat'l Bank & Trust Co.*, 882 F.2d 1, 5 (1st Cir. 1989) ("At the same time, however, the fact that a company is in the process of going out of business is ordinarily the critical element in a court's contextual assessment of the 'reasonability' of the company's capital for the post-transfer period."); *Aero Planning Intern., Inc. v. Air Assocs., Inc.*, 764 P.2d 610, 612 (Or. Ct. App. 1988) ("Moreover, the facts that the defendant corporations are now out of business and cannot pay plaintiff's judgment are not a sufficient basis on which to conclude that they were undercapitalized.").

This same reasoning explains why we attach no relevance to the fact GCI no longer had any employees or business operations. The district court viewed this as evidence GCI was a sham. It is not. Instead, it is evidence Gardner sold the business to a legitimate third party for substantial value and ceased operations as part of the transaction. The fact that the company ceased operations without paying all of its creditors is not the sort of injustice, standing alone, that warrants piercing the corporate veil. *See N.L.R.B. v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 341 (6th Cir. 1990) ("The mere fact that the company ceased operation without being able to pay all of its debts is, of course, not the sort of

injustice contemplated. This form of injustice, if that is the correct term for it, is present in every case."); *Lakeview Commons v. Empower Yourself*, 802 N.W.2d 712, 717 (Mich. Ct. App. 2010) ("While Troy admitted that part of the reason Empower ceased operations was to avoid the lease agreement with plaintiff, this alone was not sufficient to raise a genuine issue of material fact regarding whether Empower's or Hamsa's corporate veils should be pierced."); *Arrow Uniform Rental, L.P. v. Longazel*, 2009-Ohio-868, 2009 WL 478620, at *6 (Ohio Ct. App. Feb. 26, 2009) (holding shareholder was not liable for corporate debts through veil piercing where the company's assets were sold).

With respect to the misuse of corporate funds, the evidence does show Gardner used corporate funds to pay certain personal expenses. This is certainly improper but also certainly not atypical for a closely-held owner-operator business. Given the lack of any other evidence in favor of imposing liability on Gardner for GCI's judgment debt, we do not think this single fact, standing alone, warrants the extreme remedy of imposing personal liability on a shareholder for a corporate obligation. We reverse the judgment of the district court on the claim to pierce the corporate veil. Gardner shall not be jointly and severally liable for the judgment in the wage-payment case.

IV.

Gardner contends the district court erred in awarding supplemental attorney fees. Some additional background is required. After the district court entered judgment in the fraudulent-transfer action, Gardner satisfied the existing judgment in the wage-payment case. The district court then awarded supplemental fees pursuant to the order in the fraudulent-transfer action. In awarding these fees, the

district court emphasized the "the ruling in the associated equitable action," which found Gardner "engaged in fraudulent efforts to transfer [GCI's] assets and conceal them from [Algreen]." Because we have concluded the fraudulent-transfer claim was not supported by substantial evidence, and because there is no basis for determining what portion of the attorney fee award related to Algreen's success on the merits of that claim, we cannot apportion and reduce the attorney fee award in any principled way. We thus conclude it is necessary for the district court to determine whether the attorney fee award is still appropriate under the circumstances and the amount of any such award. We vacate the portion of the judgment awarding supplemental attorney fees and remand this matter for reconsideration of the issue. *See Dutrac Cmty. Credit Union v. Hefel*, No. 15-0143, 2015 WL 7574230, at *10 (Iowa Ct. App. Nov. 25, 2015) (remanding attorney fee award for "clarification and a 'fresh consideration'"); *Luke v. Valdez*, No. 11-0750, 2012 WL 1058197, at *3 (Iowa Ct. App. Mar. 28, 2012) ("In light of this modification, we remand for a redetermination of the trial attorney fee award.").

V.

Algreen requests appellate attorney fees for having to defend this appeal. Given our disposition in Gardner's favor, such an award would be inappropriate. Considering the facts of this case, we decline to award appellate attorney fees.

VI.

In light of the foregoing, we reverse the district court in the equitable action and remand for dismissal of that action. We also vacate the judgment awarding

supplemental attorney fees and remand for reconsideration of whether supplemental attorney's fees are still appropriate and, if so, in what amount.

**REVERSED AND REMANDED.**

Tabor, J., concurs;  Doyle, P.J., dissenting in part.

**DOYLE, Presiding Judge** (concurring in part and dissenting in part)**.**

I concur in the majority's vacation of the punitive damage award and declination to award Algreen appellate attorney fees part, but I respectfully dissent from the majority's disposition of the fraudulent-transfer claim and award of supplemental attorney fees.

**Fraudulent Transfer.** The majority opinion on this point is thoughtful and well-written. Nevertheless, I find sufficient evidence that a fraudulent transfer occurred. "The doctrine of fraudulent conveyances advances the principle that a debtor's property constitutes a fund from which the debtor's obligations should be paid and the debtor may not frustrate a creditor's right to obtain satisfaction from the fund." *Benson v. Richardson*, 537 N.W.2d 748, 756 (Iowa 1995) (citation omitted). Iowa's former Uniform Fraudulent Transfer Act (UFTA), governs this appeal.[1] The use of the word "fraudulent" in the title of the Act is a misnomer in that fraud is not a necessary element of a claim for relief under the UFTA.[2] The majority opinion sets forth applicable law and I need not repeat it here.

---

[1] 2016 amendments repealed the Uniform Fraudulent Transfer Act and enacted the Uniform Voidable Transactions Act. The chapter is now cited as the "Iowa Uniform Voidable Transactions Act." Iowa Code § 684.15 (2018).

[2] Recognizing that words matter, the National Conference of Commissioners on Uniform State Laws changed the title of the Uniform Fraudulent Transfer Act to the "Uniform Voidable Transactions Act" by 2014 amendments. The official comments are illuminating:

> The 2014 amendments change the short title of the Act from "Uniform Fraudulent Transfer Act" to "Uniform Voidable Transactions Act." The change of title is not intended to effect any change in the meaning of the Act. The retitling is not motivated by the substantive revisions made by the 2014 amendments, which are relatively minor. Rather, the word "Fraudulent" in the original title, though sanctioned by historical usage, was a misleading description of the Act as it was originally written. Fraud is not, and never has been, a necessary element of a claim for relief under the Act. The misleading intimation to the contrary in the original title of the Act led to confusion in the courts. See*, e.g.,* § 4, Comment 10. The misleading insistence on "fraud" in the original title also contributed to the evolution of

There is direct evidence of Gardner's intent to hinder, delay, or defraud Algreen as a creditor. When Algreen asked about his unpaid wages after his termination, Gardner told Algreen that he would "never see a dime." The evidence clearly shows Gardner undertook a course of action to make good on his promise. In the wage-dispute action, the district court observed that Gardner's animosity toward Algreen "was palpable in the courtroom and from the witness stand." In its ruling on the fraudulent-transfer action, the court found it "abundantly evident" that "Gardner harbors personal spite and disdain for Algreen." Standing on its own, this evidence would not support a finding that the transfer was fraudulent as to Algreen. "[O]rdinarily a debtor may prefer one creditor over another, 'even if the debtor's intentions . . . are spiteful and the action will delay or prevent the nonpreferred creditor from obtaining payment.'" *Ralfs v. Mawry*, 586 N.W.2d 369, 373 (Iowa 1998).

But, in addition to the direct evidence of Gardner's intent to hinder, delay, or defraud Algreen as a creditor, several badges of fraud are also present. Gardner testified that he began negotiating a sale of GCI in the spring of 2013—almost one year after GCI terminated Algreen. Gardner was well aware of Algreen's claim for unpaid wages before the sale negotiations began. Algreen filed his lawsuit for

---

widely-used shorthand terminology that further tends to distort understanding of the provisions of the Act. Thus, several theories of recovery under the Act that have nothing whatever to do with fraud (or with intent of any sort) came to be widely known by the oxymoronic and confusing shorthand tag "constructive fraud." See §§ 4(a)(2), 5(a). Likewise, the primordial theory of recovery under the Act, set forth in § 4(a)(1), came to be widely known by the shorthand tag "actual fraud." That shorthand is misleading, because that provision does not in fact require proof of fraudulent intent. See § 4, Comment 8.

Unif. Voidable Transactions Act (2014) § 15 cmt 1, 7A pt.II U.L.A. 242 (2017).

unpaid wages more than four months before GCI sold its book of business. Gardner had notice of the suit prior to the sale. In spite of this, the purchase agreement falsely represented that there were no lawsuits pending against GCI.[3] Because the proceeds of the sale of the book of business went to Gardner personally, the sale left GCI with no ability to satisfy Algreen's wage payment claim. Gardner acknowledged it was GCI's assets being sold but he was unable to provide any explanation as to why he personally received the payments rather than GCI; he just replied, "That's how we did it." Pressed further on the issue, he just said he had no explanation. Gardner made no attempt to satisfy any part of the wage-dispute judgment with the proceeds he received from the sale. Gardner deposited the payments for GCI's assets in his personal checking account. Gardner testified at the judgment debtor examination that he did not intend to satisfy judgment. Gardner claimed to have spent all of the $1.2 million he had received in payment for the sale at the time of trial. He used some of the money to satisfy obligations or other business interests he had, but none of the money was used to satisfy any debt or liability of GCI. He testified he felt no personal responsibility to satisfy GCI's debts and liabilities. Other than making a $30,000 offer of judgment three weeks before the fraudulent-transfer trial, Gardner testified he had taken no steps to satisfy Algreen's wage-payment judgment and that he had no intention of taking any steps in the future to satisfy the judgment. He

---

[3] Gardner represented and warranted in the April 2014 purchase agreement that, "There are no actions, lawsuits or proceedings of any kind threatened against the BOOK, Gardner Crop Insurance, Inc., Timothy E. Gardner or Walter Gardner, Jr. relative to the BOOK, or the basis for any such actions, lawsuits, or proceedings." Gardner testified at the judgment debtor examination that he called CGB in September 2013 when the wage-dispute lawsuit was filed, "explained what it was, and they were aware of it." He testified a representative of CGB "just said okay."

admitted, that as of the time of trial, Algreen had not seen a dime of the unpaid commissions and base pay GCI owed him.

When considering Gardner's direct actions with the surrounding circumstances, I conclude clear and convincing evidence shows Gardner structured the sale of GCI's book of business to hinder, delay, or avoid paying the judgment owed to Algreen. To be clear, I am not to saying the sale of GCI to CGB was not a bona fide sale; no one disputes the reasonableness of the sales price. But the way the deal was structured—with all of GCI's assets being sold and cash payments being made directly to Gardner not GCI— any opportunity for Algreen to collect from GCI was thwarted. Moreover, had Algreen garnished CGB after the sale, CGB would, no doubt, have answered, that it was not indebted to the judgment debtor, GCI. Under the purchase agreement terms, that answer would have been true—it was contractually indebted to Gardner, not GCI.

"[E]ven if a debtor has at least one non-fraudulent motive for a transaction, the additional motive of effecting the transaction to hinder a creditor 'is a sufficient ground for an unassailable conclusion [of] ... fraudulent intent [under the UFTA].'" *Bertram v. WFI Stadium, Inc.*, 41 A.3d 1239, 1247 (D.C. 2012) (internal citation omitted). Gardner presented no evidence to the contrary. I therefore conclude the sale of GCI to CGB was a fraudulent transfer, as defined under section 684.4, as to Algreen. I would affirm the district court's judgment that Gardner and GCI are jointly and severally liable for the judgment entered in Algreen's favor in the wage-dispute action. The remedy fashioned by the district court is consistent with the

remedies available under section 684.7, and, in any event, Algreen's wage-payment judgment has already been satisfied.[4]

**Punitive Damages.** I concur with the majority's disposition of the punitive damages award for the following reasons. Section 684.7 does not specifically provide for punitive damages as a remedy available to a creditor,[5] but it does provide that a creditor may obtain "[a]ny other relief the circumstances may require." Iowa Code § 684.7(1)(c)(3). Under Iowa Code section 668A.1(1)(a), "to receive punitive damages, a plaintiff must prove by a preponderance of clear, convincing, and satisfactory evidence that the defendant's conduct amounted to a willful and wanton disregard for the rights of another." *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co. of Des Moines*, 510 N.W.2d 153, 156 (Iowa 1993). Merely objectionable conduct is not sufficient. *See id.* "[Punitive] damages may be awarded where it appears that the defendant is guilty of fraud." *Syester v. Banta*, 133 N.W.2d 666, 676 (Iowa 1965) (citation omitted). The question is whether Gardner's conduct constituted willful or wanton disregard for Algreen's rights.

Willful and wanton conduct occurs when "[t]he actor has intentionally done an act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences." *Miranda*

---

[4] On December 15, 2016, $75,685.60 was tendered to the clerk of court for payment in full of the judgment in the wage-dispute matter. The next day, GCI filed a "Computation of Judgment Payoff" showing how the amount was computed, including accrued interest. The court ordered the clerk to deliver the amount to Algreen's counsel and to show payment on the judgment. A satisfaction of judgment was filed acknowledging payment in full on the April 2015 wage-dispute judgment.

[5] Probably because fraud is not a necessary element of a claim for relief under the UFTA.

*v. Said*, 836 N.W.2d 8, 34 (Iowa 2014) (alteration in original) (citation omitted). Stated differently, a plaintiff can recover punitive damages only if actual or legal malice is shown. *See Cawthorn v. Catholic Health Initiatives Iowa Corp.*, 743 N.W.2d 525, 529 (Iowa 2007).

> Actual malice may be shown by such things as personal spite, hatred, or ill-will and legal malice may be shown by wrongful conduct committed with a willful or reckless disregard for the rights of another. . . . Thus, merely objectionable conduct is insufficient . . . . To receive punitive damages, plaintiff must offer evidence of defendant's persistent course of conduct to show that the defendant acted with no care and with disregard to the consequences of those acts.

*Id.* (citations omitted).

Although there is evidence of animosity by Gardner toward Algreen, I do not believe it rises to that level of actual or legal malice necessary to support an award of punitive damages. "[O]rdinarily a debtor may prefer one creditor over another, 'even if the debtor's intentions . . . are spiteful and the action will delay or prevent the nonpreferred creditor from obtaining payment.'" *Ralfs*, 586 N.W.2d at 373. With that in mind, I do not find a preponderance of clear, convincing, and satisfactory evidence that Gardner's conduct rose to that level amounting to a willful and wanton disregard for the rights of Algreen. Because insufficient evidence supports it, I agree the punitive damages award must be vacated.

**Attorney Fees.** After entry of the judgment in the fraudulent-transfer action, Algreen filed a supplemental application seeking $21,065.00 attorney's fees and $1137.18 expenses incurred since the April 2015 entry of the judgment in the wage-dispute case. GCI resisted. After a hearing, the district court awarded

Algreen the $22,202.18 in fees and expenses he requested and entered judgment against GCI in that amount.

Gardner claims the district court did not have authority to award supplemental attorney fees. He notes that Algreen did not request an award of attorney fees in the fraudulent-transfer action and argues that the court was therefore without authority to award attorney fees for in that action.

Ordinarily, a successful party cannot recover attorney fees unless authorized by statute or agreement. *See Maday v. Elview–Stewart Sys. Co.*, 324 N.W.2d 467, 469 (Iowa 1982). Iowa Code section 91A.8 specifically provides that an employer that has intentionally failed to pay an employee's wages shall be liable for "any attorney's fees incurred in recovering the unpaid wages and determined to have been usual and necessary." Accordingly, if an employee prevails on a claim for unpaid wages under chapter 91A, the district court is required to assess attorney fees against the employer when requested. *See Audus v. Sabre Commc'n Corp.*, 554 N.W.2d 868, 874 (Iowa 1996).

In the judgment entry for the wage-dispute action, the court stated it would "reserve jurisdiction to consider any supplemental claims for attorney fees and expenses necessitated in Iowa Code section 91A.8 collection activities undertaken by Algreen." The order was never appealed, and as such, it is binding. *See City of Ankeny v. Armstrong Co.*, 353 N.W.2d 864, 867 (Iowa 1984).

In granting Algreen's application for supplemental attorney fees and expenses, the district court stated:

> [Gardner] refused to pay the judgment voluntarily. According to the court's ruling in the associated equitable action, [Gardner] engaged in fraudulent efforts to transfer its assets and conceal them from

[Algreen]. [Algreen]'s execution on [Gardner] had previously been returned unsatisfied. There is no satisfactory showing that any of the ordinary methods of collection would have been successful in this case.

[Algreen] therefore filed a separate action for fraudulent transfer and piercing the corporate veil against both [Gardner] and Timothy Gardner. [Gardner] allowed this case to proceed all the way through trial, on full notice that litigation expenses were mounting. [Gardner] did not pay the judgment until after [Algreen] had successfully brought this action to a conclusion. Surely [Gardner] may not now be heard to complain that [Algreen]'s methods were "unusual and unnecessary," when it was [Gardner]'s own actions, now judicially determined to be deceitful, which required the separate lawsuit.

Although Algreen was entitled to payment for the wages he earned while working for GCI, Gardner refused to pay them. He was forced to file a wage-payment action. Gardner then embarked on a course of action to hinder and delay payment of those wages and commissions. Gardner's attempts to avoid paying Algreen included structuring the sale of GCI's assets to hinder Algreen's ability to collect the wages and commissions due him. After trying unsuccessfully to collect on his wage-payment judgment, Algreen resorted to filing the fraudulent-conveyance action and incurred additional attorney fees in litigation of that action. As a direct result of that litigation, Algreen finally recovered his unpaid wages and commissions. The attorney fees and costs Algreen incurred in the fraudulent-transfer action should be recoverable as part of his judgment in the wage-dispute action. I conclude the district court did not err in ordering that Gardner and GCI be jointly and severally liable to pay Algreen's supplemental attorney fees and expenses.

Gardner also challenges the amount of supplemental attorney fees awarded, arguing they are not usual or necessary. We review challenges to the

amount of attorney fees awarded for abuse of discretion. *See Lee v. State*, 906 N.W.2d 186, 194 (Iowa 2018). The trial court's discretion in awarding attorney fees is broad but not unlimited. *Gabelmann v. NFO*, Inc. 606 N.W.2d 339, 342 (Iowa 2000). We presume the trial court's award is correct unless the complaining party shows the contrary. *See Lee*, 906 N.W.2d at 194*.*

Gardner does not argue the hourly fee or the amount of hours charged by Algreen's attorney are unreasonable. He instead claims there was another less-costly means by which Algreen could have collected his judgment. His argument is unavailing. I believe Gardner committed statutory fraud to avoid paying the judgment owed to Algreen. It is disingenuous for Gardner to argue Algreen should have pursued alternate and cheaper collection methods. There was no showing that electing an alternate collection method would have met with any success, particularly in view of the hurdles Gardner placed in Algreen's path.

Because Gardner has failed to rebut the presumption that the court's award of attorney fees was correct, I would allow the supplemental attorney fee award to stand.

**Appellate Attorney Fees.** I concur with the majority's declination to award Algreen appellate attorney fees.